**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Eugene LESLIE, Defendant-Appellant.**

No. 83–3719.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 1986.

Robert Glass, New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Howat A. Peters, Jr., Harry McSherry, Fred P. Harper, Jr., Asst. U.S. Attys., New Orleans, La., Sidney M. Glazer, Sara Crisitelli, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before CLARK, Chief Judge, and BROWN, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant Leslie appeals his conviction for conspiring to distribute narcotics and possessing narcotics with intent to distribute them, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Rejecting his other complaints, a divided panel of this Court sustained Leslie's contention that the district court erred by failing to inquire into the prosecutor's motives for peremptorily challenging black venirepersons, although there was no claim or showing that the challenges were made for purposes unrelated to the outcome of the particular case being tried or were any part of a systematic practice of excluding blacks from jury service. 759 F.2d 366 (5th Cir. 1985). The panel majority rested its holding in this respect "upon our supervisory power over federal district courts and federal prosecutors." *Id.* at 374. This Court, en banc, disagreeing with the panel's resolution of the peremptory challenge issue, affirms Leslie's conviction.[1]

We hold that where in a given trial the prosecutor's peremptory challenges are made for the purpose of procuring a jury more likely than otherwise to convict in that particular case, and are not made for purposes unrelated to the case being tried or as any part of a systematic practice of attempting to exclude blacks from jury service, the challenges are not rendered improper because they are made in whole or in part on the basis of the group affiliations, including race, of the challenged venirepersons. We further hold that where, as here, there is neither claim nor *prima facie* showing that the prosecutor's peremptory challenges were exercised either as any part of a systematic practice of attempting to exclude blacks from jury service or other than for purposes of the particular case being tried, it is a misuse of whatever supervisory authority we may have in the premises to require judicial inquiry into the prosecution's reasons or motives for its peremptory challenges.

The facts of this case, and the Supreme Court's opinion in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), constitute the framework of our analysis.[2]

## I.

### Context Facts

Appellant Leslie was tried in New Orleans, along with Fernando Giron, a Honduran, on charges of distributing and conspiring to distribute cocaine. After the first day of trial, Giron pleaded guilty and testi-

---

1. This case was taken en banc primarily to address the peremptory challenge matter. Leslie's other complaints relate to the admission in evidence of plea agreement letters between the government and certain of its witnesses, and the trial court's refusal to permit Leslie to impeach the government's witness Giron by testimony of Giron's lawyer, Moriarty. The en banc court concludes that the panel correctly rejected these contentions, and the panel opinion in respect thereto is reinstated. Respecting Moriarty's proffered testimony, the writer remains of the

view expressed in the panel dissent. 759 F.2d at 403 n. 35.

2. We are, of course, aware that the Supreme Court has granted certiorari in *Batson v. Kentucky,* — U.S. ——, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985), where the issue presented concerns the constitutional validity of the state prosecutor's use of peremptory challenges to remove all black venirepersons from the jury panel. *Batson,* being a state prosecution, does not directly implicate the supervisory power issue.

fied for the government. Other significant witnesses for the government were Claude Griffin, who testified that he had acquired cocaine from Giron and distributed it to Leslie, who then redistributed it, and Thomas Gray, who had transported cocaine from Houston to New Orleans for Griffin, received money from Leslie in exchange for the drugs, and then given the money to Griffin. Giron, Griffin, and Gray are white; Leslie is black.

The record contains no transcript of the *voir dire* or jury selection process, although it does include the jury list showing those removed for cause and by peremptory challenge. When the court completed excusing venirepersons for cause, the jury panel had been reduced to twenty-eight, of whom six were black. The government used its six peremptory challenges to remove these six blacks, and the defense used its ten peremptory challenges to remove ten whites. Of the four persons comprising the alternate pool, one was black; the government used its alternate peremptory to remove this individual, and the defense used its alternate peremptory to remove a white from the alternate pool. The procedure and order of exercising peremptory strikes are not reflected in the record.

After the peremptories were completed, Leslie's counsel moved for a mistrial. He complained that the government used its peremptories to remove all the blacks from the jury and alternate pools. The Assistant United States Attorney stated that those challenged were "not struck on the basis of race" and offered to give "an in camera reason," which the trial court declined. The trial court then inquired of Leslie's counsel why he was entitled to mistrial, to which counsel responded:

"Well, the last Supreme Court decision on the subject said that peremptory challenges without demonstrating a pattern or practice, peremptories which strike all blacks, are within the system. But that doesn't eliminate the Court's discretion.

"And in this case, Mr. Leslie is a black man in this community; he has standing in the black community. And without a single black on that jury, there is no way to communicate through peers in this community."

The trial court denied the motion for mistrial, and Leslie's counsel objected stating, "there is no apparent reason, other than race, for the striking."

The matter was not raised again in the trial court, either by motion for new trial or otherwise. No attempt was ever made to analyze or comment on the *voir dire.* Nothing was said concerning the composition of the venire panel except in terms of who on it was black and who was white. Leslie never claimed that anything similar had ever before occurred or would likely occur again, or that there was any attempt to utilize peremptory strikes for purposes other than the outcome of the case being tried.

In his initial appellant's brief, Leslie casts his complaint in the following context:

"Eugene Leslie, a prominent black fight promoter and trainer in the City of New Orleans, was tried by an all white jury ... on cocaine charges.... No significant witness against Leslie was black....

"The government's theory was that Claude Griffin ... had bought cocaine from a Honduran, Leslie's co-indictee Fernando Giron, in Houston, Texas. Griffin sold a part of the cocaine to defendant Leslie....

"FBI agents ... intercepted phone calls between Griffin and Leslie. These telephone calls did not mention cocaine. The calls, however, sounded suspicious to FBI ears since Leslie had repetitively and in varying forms asked Griffin whether there was 'anything yet.'

"The defense presented an entirely innocent explanation for the style of the conversations with Griffin: it was typical for Leslie, a black man, to speak in shorthand about things which he and the other individual in the conversation understood....

"Leslie explained the true meaning of his conversations with Griffin in the fol-

lowing manner. Leslie had first met Griffin in Griffin's capacity as an airconditioning repairman and installer. They struck up a friendship; Leslie visited Griffin, and Griffin visited Leslie. At Griffin's house, Leslie met the co-indictee, Fernando Giron, who was from Honduras.... Griffin and Giron talked about young Honduran fighters, and the possibility of their coming to the United States for training; Leslie, ever ready for the opportunity to train a champion, was interested in developing that connection.

"....

"Along with the suspicious conversations of Leslie with Griffin, the FBI had recorded similarly suspicious conversations by Griffin with another prominent black man in the city, the funeral director Alton Glapion. Glapion was a closer friend of Griffin's than was Leslie. Griffin had known Glapion for 20 years, Leslie for under two.... Griffin was then involved in major business dealings with Glapion and Glapion was ready, willing and able to put up his funeral home for bond for Griffin; Leslie on the other hand owed Griffin money.... It was the defense theory of the case ... that when Griffin said the oil conversations with Leslie were about cocaine, while the oil conversations with Glapion were about oil, ... that he had made a self-preserving choice; Griffin had given up the innocent Leslie to protect the also innocent Glapion in order to preserve his credibility, and thereby to save himself and his family, who were indicted along with him, from certain annihilation by the government.[3]

---

**3.** Leslie's brief elaborates on this point as follows:

"In other words, it was the belief of the defense that Griffin, faced with similarly suspicious intercepted telephone conversations from his two black friends, Glapion and Leslie, could not say that both of them were innocent of wrongdoing, even though that were true. Griffin could not exculpate both of his black friends, and still be believed to the extent that he would receive misdemeanors for his involved family members, and his

"....

"... To acquit the defendant Leslie, a black fight promoter from New Orleans, the jury had to be open to the possibility that Leslie had spoken to Claude Griffin, the principal prosecution witness, in a shorthand that was not code for cocaine. There was no black juror to explain to the rest of the jurors in their deliberations that there was nothing irregular about Leslie's speech patterns; to mediate between Leslie's lifestyle and that of the white jurors; or to evaluate the credibility of the defense from the black perspective."

Fairly construed then, Leslie has not complained that the prosecution's exercise of peremptory challenges here was motivated by *anything* other than an attempt to enhance the chances that the verdict in *this case* would be favorable to it. There is no allegation or suggestion that these strikes were any part of an effort to prevent black citizens from serving on criminal juries, or were motivated by any personal desire on the part of the Assistant United States Attorney not to associate with blacks. Rather, Leslie complains that, because of the peculiar factual setting of this case, he needed one or more black jurors to "translate" his speech and conduct to the rest of the jury; in effect, to vouch for his explanation of the suspicious conversations and activities.[4] There is no suggestion of complaint that the prosecution did other than make its strikes in an effort to procure, from among those summoned and not disqualified, a jury which, under the facts of this particular case, would least likely be partial to Leslie, by excluding blacks as individuals either more prone to adopt a

single count deals.... He was forced to choose, and so chose his greater friend, Glapion, over his lesser friend, Leslie. Griffin therefore implicated Leslie, as the least of the horribles with which he had to contend and choose."

**4.** Leslie's brief describes this as "a case where the black defendant's mode of conversation, position in the community and lifestyle required translation to the jury for the defense to be credibly received."

role of translator, and then spokesman, for Leslie or perhaps as being more likely susceptible to influence on behalf of one so prominent in the black community. This is also apparent from Leslie's statement in his brief, repeated in substance at panel oral argument, that:

> "Indeed, there is no pattern or practice in the United States District Court for the Eastern District of Louisiana which could be proved up by a systematic and exhaustive examination of the peremptory practices of the prosecutors. Black jurors are no less prosecution oriented in most cases than are jurors of other races."

## II.

### Discussion

Accordingly, the question here is not whether the prosecution may peremptorily challenge blacks in an effort to deny citizens of that race the right and privilege of serving on criminal juries. *Nor* is it what character of proof suffices to sustain such a claim, *prima facie* or otherwise. No such claim has been fairly presented. Rather, the issue here is whether the prosecution may take race or similar group characteristics into account when it exercises a peremptory challenge for the sole purpose of procuring a jury least likely to be partial to the defense, in light of the discrete facts of the particular case being tried.

*Swain v. Alabama*

The resolution of this issue is controlled by the analysis in part II of the Supreme Court's opinion in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). As in this case, the prosecution in *Swain* peremptorily struck all six black venirepersons on the jury panel, with the result that the black defendant was tried by an all-white jury.

So far as it concerned peremptory challenges by the prosecution based on race or similar group membership, *Swain* distinguished between and dealt separately with *two* types of such challenges: *first,* those made for the purpose of prevailing in the particular case being tried, which it addressed in part II; *second,* those made "for reasons wholly unrelated to the outcome of the particular case on trial ... to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population" (*id.* 85 S.Ct. at 838), which it considered in part III. The distinction between the two categories of racially based peremptory challenges is likewise reflected in the description of the second type as being the kind the prosecution would make "whatever the circumstances, whatever the crime and whoever the defendant or the victim may be." *Id.* at 837. In *Swain* part II, the Court held that racially based peremptory challenges of the first kind were a proper and a traditional part of the jury system as known to the common law and American jurisprudence. In its part III, the *Swain* Court strongly intimated that racially based peremptory challenges of the second kind were improper, but did not expressly so rule since it held that no sufficient showing had been made that the challenges in question were of that kind.

Justice Goldberg, joined by Chief Justice Warren and Justice Douglas, dissented. *Id.* at 840–50.[5] The dissent, however, found no fault with part II of *Swain* or its holding respecting the first type of race-based peremptory challenge. Rather, the dissent took the view that a proper *prima facie* case had been made that the race-based peremptory challenges were of the second kind. The dissent emphasized that the Alabama venire selection system, which relied in large part on subjective choices by individual jury commissioners, produced venires in the county of trial that averaged ten to fifteen percent black, although blacks constituted twenty-six percent of the population available for jury service; and

---

**5.** Justice Harlan joined in the Court's opinion, but emphasized his understanding that the Court did not ultimately decide whether or not the second type of race-based peremptory challenge, addressed in part III, was improper. *Id.* at 840. Justice Black concurred in the result without opinion. *Id.*

that "this method of venire selection cannot be viewed in isolation and must be considered in connection with the peremptory challenge system." *Id.* at 845. They particularly noted "it is undisputed that no Negro has ever served on any petit jury" in the county. *Id.* The dissent summarized its views by stating:

> "The holding called for by this case, is that *where* as here, a Negro defendant proves that Negroes constitute a substantial segment of the population, that Negroes are qualified to serve as jurors, and that none or only a token number has served on juries over an extended period of time, a prima facie case of the exclusion of Negroes from juries is then made out; ... and that the State wholly fails to meet the prima facie case of systematic and purposeful racial discrimination by showing that it has been accomplished by the use of a peremptory challenge system unless the State also shows that it is not involved in the misuse of such a system *to prevent all* Negroes from *ever* sitting on *any* jury. Such a holding would not interfere with the rights of *defendants* [emphasis in original] to use peremptories, nor the right of the State to use peremptories as they normally and traditionally have been used.

> "It would not mean ... that Negroes are entitled to proportionate representation on a jury.... *Nor would it mean* that *where systematic exclusion* of Ne-

groes from jury service *has not been shown,* a *prosecutor's motives are subject to question* or judicial inquiry *when he excludes Negroes* or any other group *from sitting on a jury in a particular case. Only* where *systematic* exclusion has been shown, would the State be called upon to justify its use of peremptories or to negative the State's involvement in discriminatory jury selection." *Id.* at 849 (footnote omitted; emphasis added).[6]

The Eighth Circuit has observed, "The very heavy burden of proof set forth in *Swain* has been extensively criticized by commentators." *United States v. Childress,* 715 F.2d 1313, 1316 (8th Cir.1983) (en banc), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984). Relatedly, it has been said that "*Swain* obviously furnishes no protection whatever to the first defendant who suffers such discrimination in any given court." *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 909, 583 P.2d 748, 767 (1978).[7] However, what these concerns are directly relevant to is the proof required to sustain a claim that the prosecution's exercise of peremptory challenges is of the *second Swain* kind. Here, as noted, we are not concerned with how such a claim is or should be proved, because no such claim has been fairly presented. What we *are* concerned with is a claim of racially based peremptory challenges of the first *Swain* kind.

*See also United States v. Newman,* 549 F.2d 240, 248–49 (2d Cir.1977) (quoting *Swain* dissent and discussing common strains in the majority and dissenting opinions); *United States v. Childress,* 715 F.2d 1313, 1315 (8th Cir.1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984) (comparing the majority and dissenting opinions, and the extent to which they agree).

**6.** Certain scholarly comment has given a similar reading of *Swain. See* Saltzburg and Powers, *Peremptory Challenges and the Clash Between Impartiality and Group Representation,* 41 Md. L.R. 337, 345 (1982):

> "The *Swain* Court thus recognized two possible motives for exercising challenges against black jurors. The first—the use of race as a proxy by which to identify probable prejudice in a particular case—was explicitly approved by all the justices, except Justice Black who concurred in the result without opinion. The Court emphasized the importance of protecting the inviolability of the peremptory strike, concluding that a court should not scrutinize a prosecutor's motive for challenging blacks in a particular case. The second—the use of challenges to keep blacks off all juries—was not approved."

**7.** Much the same thing, of course, could be said of any approach under which a material factor in the judgment in a particular case is an evaluation of the results in other similar situations over a period of time. Performance over time frequently has been looked to in venire underrepresentation cases. *See* cases and principles discussed in *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 3005, 3007, 3009, 61 L.Ed.2d 739 (1979).

We turn then to *Swain* part II for an understanding of the holding—from which no Justice on that Court, then well past a decade under the leadership of Chief Justice Warrne, dissented—that this sort of peremptory challenge is valid. Justice White commenced by stating that the defendant's motion "seeking as it did to invalidate the alleged purposeful striking of Negroes from the jury ... was properly denied." *Id.*, 85 S.Ct. at 831. He noted that "there is merit in" the state's contention that the system of peremptory strikes, described as "challenges without cause, without explanation and without judicial scrutiny," justified "striking any group of otherwise qualified jurors in any given case, whether they be Negroes, Catholics, accountants or those with blue eyes." *Id.*

The opinion traces the over 600-year-old history of the peremptory challenge at common law, observing that in one form or another "[p]eremptories on both sides became the settled law of England" and that "[t]his common law provided the starting point for peremptories in this country." *Id.* at 832. The opinion further traces the continuous existence, from the beginnings of this nation, of some form of peremptory challenge, in all trials of serious offense, by both prosecution and defense in the federal system and in all or nearly all of the states. *Id.* at 832–34. The majority took note of the existence of explicit statutory recognition of the government's right of peremptory challenge in federal courts ever since 1865. *Id.* at 832–33. Although he observed that the United States Constitution does not mandate the availability of peremptory challenges,[8] Justice White stated that "[t]he persistence of peremptories

and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury." *Id.* at 835.[9]

The opinion continues by noting:

"The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." *Id.* at 835.

It also explains that "the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable" than is required for challenges for cause. *Id.* at 836.[10] Another function of the peremptory is that it "facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause." *Id.* at 835. The state is as fully entitled to these benefits as the defendant:

"[T]he view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.' Hayes v. State of Missouri, 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 [1887]." *Id.*

As to use of peremptories on the basis of the racial or other group-related, as opposed to individual, characteristics of the challenged venireperson, *Swain* states that:

"It [the peremptory challenge] is no less frequently exercised on grounds normally thought irrelevant to legal proceedings

**8.** While several other Supreme Court opinions have also so stated, *see Stilson v. United States,* 250 U.S. 583, 40 S.Ct. 28, 30, 63 L.Ed. 1154 (1919); *United States v. Wood,* 299 U.S. 123, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936); *Frazier v. United States,* 335 U.S. 497, 69 S.Ct. 201, 206 n. 11, 93 L.Ed. 187 (1949), the Court has never been faced with a complete abrogation of the peremptory challenge.

**9.** *See Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892) ("The right of [peremptory] challenge comes from the com-

mon law with the trial by jury itself, and has always been held essential to the fairness of trial by jury.").

**10.** A related, long-recognized common-law function noted by Justice Story is that the prisoner "may not be tried by persons against whom he has conceived a prejudice." *United States v. Marchant & Colson,* 12 Wheat (25 U.S.) 480, 482, 6 L.Ed. 700, 700 (1827). *See also Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892).

or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be. It is well known that these factors are widely explored during the *voir dire,* by both prosecutor and accused.... This Court has held that the fairness of trial by jury requires no less.... Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried.

"... In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto,* would no longer be peremptory ...

"... The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes." *Id.* at 836–37 (footnotes omitted).

This language is, of course, wholly at odds with the theory of such cases as *People v. Wheeler, supra,* and *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, 514–15 *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979), that a venireperson may not properly be peremptorily challenged because of characteristics thought to be peculiarly common to any "cognizable" group of which she is a member, as distinguished from her assumed uniquely individual (or noncognizable group) characteristics. Plainly, the Supreme Court in *Swain* has held that a prosecutor may peremptorily challenge on racial (or similar group) grounds so long as he does so on "considerations related to the case he is trying, the particular defendant involved and the particular crime charged." *Swain,* 85 S.Ct. at 837.

In sum, as the Eighth Circuit said in *United States v. Carter,* 528 F.2d 844, 850 (8th Cir.1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1745, 48 L.Ed.2d 206, (1976), "the Supreme Court in *Swain* made it clear that race or other group affiliation is in fact a legitimate ground for challenge in an individual case.[11]

---

11. Similarly, we have said "the Supreme Court has recognized that the peremptory challenge cannot be subject to judicial review even when exercised by the prosecution along racial lines." *Sorenson v. Raymond,* 532 F.2d 496, 500 (5th Cir.1976) (citing *Swain* part II). This, of course, is the recognized view. *See, e.g., United States v. Thompson,* 730 F.2d 82, 85 (8th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 443, 83 L.Ed.2d 369 (1984) (prosecution peremptory challenges of blacks confessedly "based on the assumed racial affinity of these prospective jurors to designated black alibi witnesses" is sanctioned by *Swain* and does not violate the sixth amendment); *United States v. Clark,* 737 F.2d 679, 682 (7th Cir.1984) ("[t]he Supreme Court held some years ago that it is not a denial of the equal protection of the laws for a prosecutor to base peremptory challenges on racial grounds, provided that he is not doing so in pursuance of a systematic policy of racial exclusion from juries," citing *Swain* ); *United States v. Newman,* 549 F.2d 240, 249 (2d Cir.1977) (proper peremptory under *Swain* where prosecutors " 'believed that the striking of Black veniremen would lessen the risk of bias in favor of the [black] defendant' "); *United States v. Danzey,* 476 F.Supp. 1065, 1066 (E.D.N.Y.1979), *aff'd per curiam,* 620 F.2d 286, *reh'g en banc denied,* 622 F.2d 1065, 1066 (2d Cir.), *cert. denied,* 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980) (peremptory challenges "to exclude jurors of the same ethnic background as the defendant";. four judges concurring in denial of rehearing en banc state that "use of peremptory challenges based on a group bias assumption denies no cognizable legal rights 'in any particular case,' " citing *Swain,* though it might do so if used "to exclude Blacks from service as jurors in general or in a signifi-

*Sixth Amendment*

It has been suggested that *Swain* is no longer authoritative, or at least is not authoritative with respect to cases in which the sixth amendment is implicated, because it was decided some three years before it was first held, in *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), that the sixth amendment applied to the states.[12] In this connection, it is claimed that the racially based peremptory challenges of the kind sustained in *Swain* part II violate the sixth amendment's "cross-section requirement," particularly as reflected in cases such as *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). *See McCray v. Abrams*, 750 F.2d 1113, 1124–30 (2d Cir.1984), *reh'g en banc denied*, 756 F.2d 277 (1985), petition for certiorari pending, —— U.S. ——, 105 S.Ct. 2318, 85 L.Ed.2d 837 (1985).

We reject this analysis. This Court has consistently applied *Swain* in federal prosecutions where the sixth amendment has obviously always been fully applicable. Thus, we stated in *United States v. Williams*, 446 F.2d 486, 488 (5th Cir.1971):

"Appellant next contends that he was denied his constitutional right to a trial by an impartial jury. Appellant, a Negro, was tried by an all-white jury.... He objects, however, to the fact that although there were three Negroes on the twenty-eight-man jury venire, all three were peremptorily stricken by the Government prosecutor without cause or explanation, in violation of his Sixth Amendment Rights. Such a contention conflicts with the holding of Swain v. State of Alabama ... in which the Supreme Court upheld the system of peremptory challenges, explicitly finding merit in the State's argument that the system affords 'a suitable and necessary method of securing juries which in fact and in the opinion of the parties are fair and impartial.' "

Other decisions of this court applying *Swain* in federal prosecutions include: *Davis v. United States*, 374 F.2d 1, 5 (5th Cir.1967); *United States v. Pearson*, 448 F.2d 1207, 1213–14 (5th Cir.1971); *United States v. Carlton*, 456 F.2d 207, 208 (5th Cir.1972) (per curiam). We have continued with like holdings after *Taylor. See e.g., United States v. Durham*, 587 F.2d 799, 801 (5th Cir.1979); *United States v. McLaurin*, 557 F.2d 1064, 1076 (5th Cir.), *cert. denied sub nom. Hamilton v. United States*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1977). In affirming the conviction in *McLaurin*, we stated:

"They [appellants] argue that ... the government exercised its peremptory challenges in a racially discriminatory manner, the net effect of which was to deny the appellants their right to be tried by a jury which is *representative of their community.*

"... Although *Swain* of course involved state rather than federal proceedings, *we apply the same standards and analysis in* our review of *federal criminal trial." Id.* at 1076 (emphasis added; footnote omitted).

Likewise, we have continued to apply *Swain* to our consideration of habeas corpus applications arising from state convictions in trials after *Duncan* and *Taylor. See Easter v. Estelle*, 609 F.2d 756, 759–60 (5th Cir.1980); *Prejean v. Blackburn*, 743 F.2d 1091, 1103–04 (5th Cir.1984), *reh'g en banc denied*, 765 F.2d 482 (1985). In *Prejean* we followed this course despite explicit recognition of the opinions on the denial of certiorari in *McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983). We cited with approval the Elev-

cant category of cases"); *King v. County of Nassau*, 581 F.Supp. 493, 500 (E.D.N.Y.1984) ("under *Swain*, state use of racial criteria in making peremptory challenges is illegal only when the state, acting on a policy of white dominance, attempts to keep blacks off *all* juries" (emphasis in original)); *State v. Grady*, 93 Wis.2d 1, 286 N.W.2d 607, 611 (1979) ("*Swain*, as adopted, establishes race as an appropriate basis for the exercise of peremptory challenges").

**12.** In *DeStefano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (per curiam), the Court held that *Duncan* was inapplicable to cases in which trial began prior to May 20, 1968, the date *Duncan* was decided.

enth Circuit's opinion in *Willis v. Zant*, 720 F.2d 1212, 1217–21 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984), in which that Circuit stated (720 F.2d at 1219 n. 14), "[W]e decline petitioner's invitation to extend the sixth amendment's cross-section analysis under *Taylor, supra,* to the traverse jury itself." *See Prejean,* 743 F.2d at 1104 & n. 11. *See also Sonnier v. Maggio,* 720 F.2d 401, 407–08, *reh'g en banc denied,* 723 F.2d 907 (5th Cir.1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984).

These holdings are consistent with a vast host of decisions by other Circuits which have applied the *Swain* analysis in federal prosecutions, and in habeas cases for state trials after *Duncan* and *Taylor.* No useful purpose would be served by citing all of these cases. Some pre-date *Swain* itself, such as *Hall v. United States,* 168 F.2d 161 (D.C.Cir.), *cert. denied,* 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775 (1948), where the *dissent* was expressly grounded on the theory that the jury must be drawn from a cross section, with no cognizable group intentionally excluded, and that the federal courts should ensure this by use of supervisory powers over peremptory challenges. *Id.* at 165–66. *Hall* was cited with approval in *Swain,* 85 S.Ct. at 836 n. 26, and also by this Court in *Carlton,* 456 F.2d at 208.

Some of the more recent federal appellate decisions to the same effect are collected in the dissent in *McCray v. Abrams,* 750 F.2d at 1136.[13] *McCray* appears to be the first federal appellate decision reaching a contrary result, albeit over a vigorous dissent.[14] Since then, a panel of the Sixth Circuit has followed *McCray, see Booker v. Jabe,* 775 F.2d 762 (6th Cir., 1985), while a panel of the Tenth Circuit has declined to do so. *United States v. Brown,* 770 F.2d 912 (10th Cir.1985).

Before the 1978 decision in *People v. Wheeler,* the state courts had been unanimous in following the principle of *Swain. See* Annot., 79 A.L.R.3d 14 (1977). *Wheeler* itself, though it gives extensive consideration to decisions of the United States Supreme Court, is ultimately based on the California Constitution. The California Supreme Court stated:

"The court's motivation in *Swain* seems to have been its desire to avoid what it believed would be 'a radical change in the nature and operation of the [peremptory] challenge' (380 U.S. at pp. 221–222, 85 S.Ct. at p. 836), and we strongly suspect that desire has survived the advent of the *Taylor* rule. We therefore assume that if the present question were before the high court it would reaffirm *Swain* and reach the same result under

**13.** These are *Willis v. Zant,* 720 F.2d 1212, 1219 n. 14 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984); *United States v. Childress,* 715 F.2d 1313 (8th Cir.1983) (en banc), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); *United States v. Whitfield,* 715 F.2d 145, 146–47 (4th Cir.1983); *Weathersby v. Morris,* 708 F.2d 1493, 1497 (9th Cir.1983), *cert. denied,* 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984); *United States v. Canel,* 708 F.2d 894, 898 (3d Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 151 (1983); *United States v. Jenkins,* 701 F.2d 850, 859–60 (10th Cir.1983). *See also United States ex rel. Palmer v. DeRobertis,* 738 F.2d 168, 172 & n. 3 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 241 (1984) (rejecting argument against application of *Swain* based on opinions on denial of certiorari in *McCray v. New York,* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983)); *United States v. Newman,* 549 F.2d 240, 244, 246 (2d Cir.1977); *United States v. Danzey,* 476 F.Supp. 1065, 1067 (E.D.N.Y.1979), *aff'd per*

*curiam,* 620 F.2d 286, *reh'g en banc denied,* 622 F.2d 1065 (2d Cir.), *cert. denied,* 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980); *United States v. Thompson,* 730 F.2d 82, 85 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 443, 83 L.Ed.2d 369 (1984); *United States v. Clark,* 737 F.2d 679, 681–82 (7th Cir.1984); *United States v. Calhoun,* 542 F.2d 1094, 1103 (9th Cir.1976).

**14.** As reflected in the opinions on denial of rehearing en banc, *McCray's* precedential value is undermined "by the lack of adversity between the litigants on the central issue in the case," leading at least one member of the Second Circuit to view it as not binding on future panels of that Court. *McCray v. Abrams,* 756 F.2d at 278.

Two opinions of district courts in the Second Circuit have strongly criticized its opinion in *McCray. See Roman v. Abrams,* 608 F.Supp. 629, 638–42 (S.D.N.Y.1985) (Brieant, J.); *Schreiber v. Salamack,* 619 F.Supp. 1433 (S.D.N.Y.1985) (Goettel, J.).

the representative cross-section rule as it did under the equal protection clause." 583 P.2d at 767 (footnote omitted).[15]

Other states that have followed *Wheeler* have likewise based their decisions on local law. *See Commonwealth v. Soares, supra; State v. Neil*, 457 So.2d 481, 486 (Fla.1984); *Riley v. State*, 496 A.2d 997 (Del.1985); *State v. Gilmore*, 199 N.J.Super. 389, 489 A.2d 1175 (1985). *See also State v. Crespin*, 94 N.M. 486, 612 P.2d 716, 718 (1980).

However, the *Swain* approach remains the overwhelming majority rule among the states. Justice Marshall, dissenting from the denial of certiorari in *Gilliard v. Mississippi*, 464 U.S. 867, 104 S.Ct. 40, 43, 78 L.Ed.2d 179 (1983), observed:

"To my knowledge, in the five years since *Wheeler* and *Soares*, not a single state supreme court has imposed state constitutional limits on peremptory challenges. In fact, over the same period, at least 19 jurisdictions have considered the issue and, following *Swain*, reaffirmed their view that the exclusion of Negroes by peremptory challenges is constitutional in the absence of evidence of systematic exclusion." (Footnotes omitted.)[16]

Moreover, when *Swain* was decided the cross-section principle already had long been established, and was indisputably applicable to the states at least as it pertained to the *Swain* context, namely, a black defendant challenging his conviction on the ground that the jury selection procedures tended to reduce the presence of blacks in the venire and on the jury below the level of a representative cross section. Thus, Justice White stated for the court in *Taylor*:

"A unanimous Court stated in Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940), that '[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.' ... A state jury system that resulted in systematic exclusion of Negroes as jurors was therefore held to violate the Equal Protection Clause of the Fourteenth Amendment.

"... In Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953), the Court declared that '[o]ur duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty.'

"....

"The unmistakable import of this Court's opinions, at least since 1940, Smith v. Texas, *supra*, and not repudiated by intervening decisions, is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." 95 S.Ct. at 696–97.[17]

---

**15.** The *Wheeler* opinion also observes that Justice White is the author of both *Swain* and *Taylor*. *See Wheeler*, 583 P.2d at 767 n. 33.

**16.** The state decisions which have considered and rejected *Wheeler* and *Soares* are cited in footnote 3 to Justice Marshall's dissent. 104 S.Ct. at 43 n. 3. *See also* cases cited in *State v. Neil*, 457 So.2d 481, 484 n. 3 (Fla.1984), and in *People v. Williams*, 97 Ill.2d 252, 73 Ill.Dec. 360, 363, 454 N.E.2d 220, 233 (1983), *cert. denied*, 466 U.S. 981, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984). For earlier decisions *see* Annot., 79 A.L.R.3d 14 (1977). Since Justice Marshall wrote, appellate courts in Florida, Delaware, and New Jersey can be added to those following *Wheeler, see State v. Neil, supra; Riley v. State, supra;* and *State v. Gilmore, supra.* Maryland can likely be considered as in the undecided, rather than the

anti-*Wheeler*, faction, *see Lawrence v. State*, 295 Md. 557, 457 A.2d 1127, 1133 (1983). And appellate courts in Indiana, Arizona, Nevada, and Colorado have joined the ranks of those rejecting *Wheeler*. *See Hobson v. State*, 471 N.E.2d 281, 285–86 (Ind.1984); *State v. Wiley*, 144 Ariz. 525, 698 P.2d 1244 (1985) (en banc); *People v. Fields*, 697 P.2d 749 (Colo.App.1984) (certiorari granted by Colorado Supreme Court, No. 84 S.C. 382, March 11, 1985); *Nevius v. State*, 699 P.2d 1053 (Nev.Sup.Ct., 1985) (petition for rehearing pending). *See also People v. Lyles*, 106 Ill.2d 373, 87 Ill.Dec. 934, 478 N.E.2d 291 (1985); *Booker v. State*, 449 So.2d 209, 222 (Miss.1984).

**17.** This is not to say that application of the sixth amendment to the states added nothing to the jury selection question. Rather, what it added

Indeed, *Swain* part II is largely based on an analysis of the current and historical role of the peremptory challenge in the common law and American jury system generally. It particularly relies on federal criminal cases, such as *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892); *Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894); *Harrison v. United States*, 163 U.S. 140, 16 S.Ct. 961, 41 L.Ed. 104 (1896); *Miles v. United States*, 13 OTTO (103 U.S.) 304, 26 L.Ed. 481 (1881); and *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). The opinion likewise carefully traces the history of the use of the peremptory challenge in federal criminal trials up to 1965. Accordingly, it stands *Swain* on its head to suggest that it could possibly be consistent with a holding that the sixth

amendment's guarantee of trial "by an impartial jury" forbids the kind of peremptory challenge approved in *Swain* part II. That portion of *Swain* was premised on the conclusion that the type of peremptory challenge there sustained was an integral and recognized part of such a jury trial. The equal protection clause was thought not to forbid what was so clearly authorized as a significant part of the constitutionally required jury trial.

Moreover, the cross-section principle is inapplicable to the kind of group-based peremptory challenge dealt with in *Swain* part II. To begin with, the cross-section cases are largely couched in terms of *systematic* exclusion. Further, the cross-section principle is applied to the formation of the venires, not the individual juries selected from them.[18] Thus, in *Apodaca v. Oregon*,

is not material in the *Swain* context. For example, the sixth amendment allows one not a member of the underrepresented class to complain, *Taylor*, while this result is, or at least was, less clear under the equal protection clause. *See Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972); *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 2168–69, 33 L.Ed.2d 83 (1972). Further, where the underrepresented group is not a racial one, the sixth amendment's protection may be stronger than that of the equal protection clause. *See Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Hoyt v. Florida*, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). But *Swain* involved a black defendant claiming underrepresentation of his race. Finally, under the equal protection clause the statistical case is only *prima facie*, and may be rebutted by a sufficiently strong showing that there was no discriminatory intent or that any such intent had no determinative effect, while under the sixth amendment the response to the same threshold showing must be one of "adequate justification." *Duren*, 99 S.Ct. at 670 n. 26. This is not material in the *Swain* context where the question was *whether* a threshold showing had been made.

It may also be noted that this Court has likewise long been sensitive to the cross-section principle. *See* the various opinions in *Rabinowitz v. United States*, 366 F.2d 34, 57–58, 77–79, 83 (5th Cir.1966) (Rives, J.; Brown, J.; concurring; Bell, J., dissenting in part). This has not prevented us from applying *Swain* to federal cases or post-1968 state habeas cases.

**18.** It has been suggested that *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), indicates that the cross-section re-

quirement is applied at the jury, as well as the venire, selection level. *McCray v. Abrams*, 750 F.2d at 1129. We are not persuaded.

To begin with, we have consistently held that in capital cases peremptory challenges may be used to exclude those who express hesitancy about imposing the death penalty but whose exclusion for cause is forbidden by *Witherspoon*. *See Jordan v. Watkins*, 681 F.2d 1067, 1070 & n. 2 (5th Cir.1982) (citing *Swain*); *Sonnier v. Maggio*, 720 F.2d 401, 406–07, *reh'g en banc denied*, 723 F.2d 907 (5th Cir.1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984) (citing *Swain*). *See also Dobbert v. Strickland*, 718 F.2d 1518, 1525 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984) (same). *Cf. Grigsby v. Mabry*, 758 F.2d 226 (8th Cir.) *cert. granted sub nom. Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985) (challenge for cause, but *not* peremptory challenge, of *Witherspoon* excludables violates the cross-section requirement on the guilt or innocence issue in capital case).

Justice Brennan (Justice Marshall concurring) has noted that allowing challenge for cause in a capital case where the requirements of *Witherspoon* have *not* been met violates the jury cross-section cases, stating: "Though these cases involve systematic exclusion from the jury pool and not from a particular jury, death-qualification is the functional equivalent of exclusion from the pool. The prosecution has *unlimited* ability to challenge prospective jurors for cause and uses the challenges to remove *all* members of an identifiable segment of the community *from the pool*." *Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 870 n. 10, 83 L.Ed.2d 841 (1985) (dissenting opinion) (emphasis added).

406 U.S. 404, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972), Justice White, citing *Swain,* stated:

> "*All that the Constitution forbids,* however, *is systematic* exclusion of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels; a defendant may not, for example, challenge the makeup of a jury merely because no members of his race are on the jury, but must prove that his race has been *systematically* excluded. See Swain v. Alabama, 380 U.S. 202, 208–209, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965) . . . ." (Emphasis added.)

Similarly, in *Taylor,* Justice White wrote for the Court:

> "If the fair-cross-section rule is to govern the selection of juries, as we have concluded it must, women cannot be *systematically* excluded *from jury panels from which petit juries are drawn.*
>
> " . . . .
>
> "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community *we impose no requirement that petit juries actually chosen must* mirror the community and *reflect the various distinctive groups in the population.* Defendants are not entitled to a jury of any particular composition . . . but the *jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude* distinctive groups in the communi-

ty and thereby fail to be reasonably representative thereof." 95 S.Ct. at 699, 702 (emphasis added).

And, in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), Justice White again speaking for the Court observed:

> "In order *to establish a prima facie violation of the fair-cross-section requirement, the defendant must show* (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that *the representation of this group in venires* from which juries are selected *is not fair* and reasonable in relation to the number of such persons in the community; and (3) that *this underrepresentation is due to systematic* exclusion of the group in the jury-selection process.
>
> " . . . .
>
> "Finally, in order to establish a prima facie case, it was *necessary* for petitioner to show that the underrepresentation of women, *generally and* on his venire, was due to their *systematic* exclusion in the jury-selection process." *Id.,* 99 S.Ct. at 668–69 (emphasis added).

*See also Rabinowitz v. United States,* 366 F.2d 34, 59 (5th Cir.1966) ("The focus of the law is on the list from which the jury is drawn and not on the composition of a particular jury . . . .").

Plainly, then, the cross-section theory does not speak to the use of peremptory challenges of the *Swain* part II variety.

---

Obviously, these remarks are inapplicable to peremptory challenges.

Further, where a particular ground of challenge for cause (such as opposition to the death penalty) is recognized by state law, this has an inherently systematic effect not present in the peremptory challenge exercised on an individual case basis (*i.e.,* of the *Swain* part II variety).

Moreover, *Witherspoon's* reliance on the cross-section approach has been deemphasized, while the broad discretion afforded juries in death penalty cases at that time has been seen as a particularly important factor in *Witherspoon. See Wainwright v. Witt,* 105 S.Ct. at 851, 852 n. 5.

Finally, even as to challenges for cause, *Witherspoon* and its progeny have recognized that the exclusion of "Witherspoon-excludables" is

acceptable, though obviously that has adverse "cross-sectional" effects. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978); *Wainwright v. Witt, supra. See also Smith v. Balkcom,* 660 F.2d 573, 578–83 (1981), *modified in other respects, reh'g en banc denied,* 671 F.2d 858 (5th Cir.), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *Spinkellink v. Wainwright,* 578 F.2d 582, 592, 594–95 (5th Cir.1978), *cert. denied,* 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667 (1979); *Sonnier,* 720 F.2d at 407–08; *Keeten v. Garrison,* 742 F.2d 129, 133–34 (4th Cir.1984). We have clearly rejected *Grigsby. See Watson v. Blackburn,* 756 F.2d 1055, 1056–57 (5th Cir.1985); *Knighton v. Maggio,* 740 F.2d 1344, 1346, 1351 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 241 (1985).

They are not systematic, and they do not relate to the formation of the venires.

The argument has been made that restricting the cross-section requirement to the venire selection process is meaningless, because juries decide cases while venires decide nothing. *See McCray*, 750 F.2d at 1128. This contention, however, ignores the vast difference in function and purpose between selection for a venire and selection for a jury. Exclusion from the venire summons process implies that the government (usually the legislative or judicial branch), in its capacity as the neutral structurer of the overall justice system, has made the general determination that those excluded are unfit to try *any* case. Exercise of the peremptory challenge, by contrast, represents the discrete decision, made by one of two or more opposed *litigants* in the trial phase of our adversary system of justice, that the challenged venireperson will likely be more unfavorable to that litigant in that *particular case* than others on the same venire.

Thus, excluding a particular cognizable group from all venire pools is stigmatizing and discriminatory in several interrelated ways that the peremptory challenge is not. The former singles out the excluded group, while individuals of all groups are equally subject to peremptory challenge on any basis, including their group affiliation. Further, venire-pool exclusion bespeaks *a priori* across-the-board total unfitness, while peremptory-strike exclusion merely suggests potential partiality in a particular isolated case. Exclusion from venires focuses on the inherent attributes of the excluded group and infers its *inferiority*, but the peremptory does not. To suggest that a particular race is unfit to judge in any case necessarily is *racially insulting*. To suggest that each race may have its own special concerns, or even may tend to favor its own, is not. For instance, it says nothing adverse, or even truly racial, about blacks to infer that they may be more likely to have greater antipathy to the Ku Klux Klan than whites. Finally, the role played by the decision maker is significant. If the neutral structurer of the system excludes a cognizable group, the exclusion necessarily represents the official judgment of *society* that the group is generally inferior. Under the adversary framework of a trial, however, *society* is neutral; neither side is favored, neither speaks for society. To be peremptorily challenged by one side or the other hence bespeaks a judgment which is neither societal nor even normative, but merely reflects the tactical determination of one contesting litigant's counsel that the challenged person is, under the discrete facts of that particular case, more likely to favor the other side.

Moreover, the operative effects of the peremptory challenge cannot be equated to those of the general exclusion from venire pools. All peremptory challenges have a "price" in other peremptories foregone. The jury drawn from a venire representative of all cognizable groups, but from which one group has been eliminated by prosecution group-based peremptory challenges, generally is more likely to be acquittal prone than a jury drawn from an otherwise similar venire that happens to include no members of that same group. In the latter instance, unlike the former, the prosecution could eliminate the most acquittal prone of the venire by using peremptory challenges it otherwise would have used to eliminate individuals affiliated with the group in question. Therefore, inclusion of a group in the venire is not "meaningless" to the end result simply because that group may be eliminated from the trial jury by peremptory challenge. Further, general systematic exclusion from venire pools allows greater ability to predict, in advance of the decision to prosecute, the composition of the jury which will try the case. If no cognizable group is excluded from the venire formation process, the decision to prosecute normally cannot be made with assurance that any given group will not be so represented on the particular venire from which the trial jury will be drawn that it cannot be eliminated by peremptory challenges (or can be eliminated only at unacceptable cost in terms of other peremptories foregone).

The prosecution in this case, for example, could not have known in advance that the twenty-eight venirepersons here would not have included nine instead of six blacks, or six blacks and three others whom the prosecution would have felt it imperative to peremptorily strike.

Further, mirroring of the community's mixture of all "cognizable" groups at the actual trial-jury level is not the "be all and end all" of the jury system as we have known it. If it were, we would take steps to more nearly ensure that the composition of each individual jury roughly mirrored the community's group mixture with respect, say, to male and female, "Anglo," "Hispanic," and "Black."[19] Obviously, however, any such approach is completely contrary to the jury system as we understand and have employed it throughout our history. Indeed, the Supreme Court's decisions that the sixth amendment requires neither juries larger than six nor unanimous verdicts, despite the general practice and long history of a unanimous jury of twelve, *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 1898–1900, 26 L.Ed.2d 446 (1970); *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 1623, 1625, 32 L.Ed.2d 152 (1972) (due process); *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972), necessarily bespeak the limited strength of the cross-section principle as applied even to the systematic structuring of the trial jury. Juries of six are obviously much less likely to have minority representation than juries of twelve, and unanimity obviously increases the power of the minority. The Court was plainly aware of these considerations. *See Williams,* 90 S.Ct. at 1906 & nn. 46–47. This is not to say that cross-section considerations were deemed irrelevant to such systematic structuring, but merely that they were not controlling. In respect to the five-person Georgia jury system, the Court in *Ballew v. Georgia,* 435 U.S. 223, 98 S.Ct. 1029, 1040, 55 L.Ed.2d 234 (1978), stated that "the question of representation does constitute one factor of several that, when combined, create a problem of constitutional significance under the Sixth and Fourteenth Amendments." Nevertheless, *Ballew* refused to retreat from *Williams,* despite recognition that ten-percent minorities would be wholly without "representation" in over half of six-person juries, as contrasted to less than thirty percent of twelve-person juries. *Ballew,* 98 S.Ct. at 1037.[20]

That factors other than those relating to the cross-section principle are important to

19. For example, without sacrificing random summonsing, the venire formation process could be structured to ensure that each venire roughly reflected the relative presence of such groups in the community; and jury panels could be filled by drawing from the venire's several groups in such a way as to continue this approximate division on each trial jury; further refinement would be possible by slightly changing the mix in a given fraction of juries on a rotation or similar basis. Generally speaking, however, we have made little effort even to ensure that *each* particular venire (as distinguished from venires as a whole over a period of time)—to say nothing of each actual trial jury—approximates the community's mixture of "cognizable" groups. Indeed, *Duren v. Missouri, supra,* indicates that the sixth amendment's cross-section requirement, even as applied to the presently conventional method of selecting venires, can be diluted on a systematic basis provided that "a significant state interest be manifestly and primarily advanced" thereby. 99 S.Ct. at 670.

20. The figures given in *Ballew* indicate that a ten-percent minority would have no members in fifty-three percent of the randomly selected six-person juries, one member only in thirty-six percent of such juries, and two or more members in eleven percent; with respect to twelve-person juries, there would be none of such a minority in twenty-eight percent of the juries, one member only thirty-eight percent of the time and two or more members thirty-four percent of the time. In this connection, it should also be noted that cases following the *Wheeler* approach to peremptory strikes have held that no explanation is required of a prosecution peremptory strike or strikes eliminating the only, or the only two, blacks on the venire panel. *State v. Crespin,* 94 N.M. 486, 612 P.2d 716 (1980) (one); *People v. Rousseau,* 129 Cal. App.3d 526, 179 Cal.Rptr. 892 (1982) (two). *But see Commonwealth v. DiMatteo,* 12 Mass.App. 547, 427 N.E.2d 754 (1981) (no error in refusing defense counsel's attempted peremptory challenge of the only black on the venire, where the trial court did not credit the defense's nonracial explanation).

the concept of the criminal jury is likewise reflected by the passage in *Baldwin v. New York*, 399 U.S. 66, 90 S.Ct. 1886, 1890, 26 L.Ed.2d 437 (1970), which describes "the primary purpose of the jury" as follows:

"[T]he jury interposes between the accused and his accuser the judgment of laymen who are less tutored, perhaps than a judge or panel of judges, but who at the same time are less likely to function or appear as but another arm of the Government that has proceeded against him." (Footnote omitted.)

Similarly, *Apodaca* states:

"[T]he purpose of trial by jury is to prevent oppression by the Government by providing a 'safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.' Duncan v. Louisiana, 391 U.S., at 156, 88 S.Ct., at 1451. 'Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen ...' Williams v. Florida, *supra,* 399 U.S., at 100, 90 S.Ct., at 1906." 92 S.Ct. at 1632–33.

The United States Constitution does not speak of a "cross section" or "representative" or similarly described jury. Of course, this does not mean that our jury system does not embrace cross-section values. But it *does* mean that such values are embraced in the context of, and are limited by, the overall concept of trial by jury. That concept, as *Swain* makes clear, includes peremptory challenges, both for individual and group characteristics, when made for the purposes of the particular case being tried. This is likewise evident from *Williams*, where Justice White, responding to the argument that the jury of six impermissibly diluted community cross-section representation, observed:

"Even the 12-man jury cannot insure representation of every distinct voice in the community, *particularly given the use of the peremptory challenge." Williams,* 90 S.Ct. at 1907 (emphasis added).

The same conclusion is to be drawn from Justice White's reference in *Taylor* to the Federal Jury Selection and Service Act of 1968 (Pub.L. No. 90–274, § 101, 82 Stat. 54, 28 U.S.C. § 1861 *et seq.*) as embodying a proper recognition and implementation of the principle "that the requirements of a jury's being chosen from a fair cross section of the community is fundamental to the American system of justice." 95 S.Ct. at 697. The Act expressly provides that "no person or class of persons shall be disqualified, excluded, excused, or exempt from service as jurors: *provided,* that any person summoned for jury service may be ... (3) excluded upon peremptory challenge as provided by law, ...." 28 U.S.C. § 1866(c). The *Taylor* opinion also refers to the legislative history of this Act, including the House and Senate Committee Reports. *Id.* at 697 nn. 7–8. The following from the House Committee Report is hence significant:

"The act guarantees only that the jury shall be 'selected at random from a fair cross section of the community.' It does not require that at any stage beyond the initial source list the selection process shall produce groups that accurately mirror community makeup. Thus, no challenge lies on that basis.

" ....

" ... *It should be noted, however,* that the bill does not change the method of challenging jurors at voir dire. *In particular, the bill leaves undisturbed the right of a litigant to exercise his peremptory challenges to eliminate jurors for purely subjective reasons.*" H.R. Rep. No. 1076, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 1792, 1794–95 (emphasis added).

This legislation was enacted only three years after *Swain*, and the right to peremptorily challenge for purposes of the case being tried on the basis of race or other group characteristic was then well-settled in federal prosecutions. Thus the Supreme Court in *Taylor* must have realized that Congress in 1968 included the *Swain* part II type peremptory within

those "provided by law" which Congress intended to leave "undisturbed."

■ The sixth amendment does, of course, require an "impartial" jury. This requirement of impartiality is applicable to each particular, individual jury, in each discrete case. It does not, however, imply that a party is entitled to any representative of his or her "group" on the jury,[21] even where that group is a significant one in the community where the trial takes place and from which the venire is drawn. *Taylor,* 95 S.Ct. at 702 ("[N]o requirement that petit juries actually chosen must ... reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition....").

■ What the impartiality requirement does imply is a jury *each* of whose members is willing and able to decide the case solely on the basis of the evidence introduced at trial and the instructions of the court. *See Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 2892 n. 12, 81 L.Ed.2d 847 (1984) ("The constitutional standard [is] that a juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court."). While normally only *demonstrated* and almost complete inability to put aside extraneous considerations *requires* that a challenge for cause be sustained, and it is often "scarcely possible to avoid" jurors "whose minds are entirely uninfluenced by opinions previously formed," nevertheless the *ideal* remains jurors who will "stand perfectly indifferent between the parties" and "who fe[el] no bias either way." *Queen v. Hepburn,* 7 Cranch (11 U.S.) 290, 297–98, 3 L.Ed. 348, 350 (1813). Hence, challenge for cause may properly be sustained in instances where such action is not absolutely required. *Id.* In this connection, it is also recognized that bias—*i.e.,* lack of impartiality in the referenced sense—*may* arise because of a group characteristic. *See, e.g., Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 472–73 & nn. 1–3, 75 L.Ed. 1054 (1930)[22]; *Miles v. United States,* 13 OTTO (103 U.S.) 304, 26 L.Ed. 481 (1881); *Queen v. Hepburn, supra; Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 850–51, 35 L.Ed.2d 46 (1973).[23] Though excusing jurors for such bias may reduce the cross-sectionalization of the jury, we have recognized that "[a] cross-section of the fair and impartial is more desirable than a fair cross-section of the prejudiced and biased." *Smith v. Balkcom,* 660 F.2d 573, 583 (1981), *modified in other respects, reh'g en banc denied,* 671 F.2d 858 (5th Cir.), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982).

Plainly, however, the challenge for cause is an inadequate tool for the elimination of bias. To begin with, bias exists along a continuum of strength or degree; its place on that continuum will often be impossible

---

**21.** This country has not utilized anything analogous to the ancient common-law procedure under which an alien was entitled to a jury composed half of aliens and half of citizens. *See United States v. Wood,* 299 U.S. 123, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936).

**22.** While *Aldridge* formally involved the issue of the defendant's race, not that of the jurors, it is unlikely that the question of prejudice against blacks—as in issue there—would arise with respect to a black juror. Indeed, the Court there noted that "the members of the jury were white." 51 S.Ct. at 471. Moreover, in support of its holding, *Aldridge* expressly relied on a case where the *juror's* group affiliation—membership in the Know-Nothing Party—was at issue. *Id.* at 472–73.

**23.** Though extensions of *Ham* have been rejected in *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976), and *Rosales-*

*Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1981), these later decisions nonetheless recognize the not infrequent *desirability*—though less often the inflexible absolute necessity—of inquiry into possible group prejudice of jurors. *See Ristaino,* 96 S.Ct. at 1022 n. 9 ("wiser course generally" is to inquire); *Rosales-Lopez,* 101 S.Ct. at 1636–37 (approving inquiry into prejudice against aliens). A caveat to the desirability of such an inquiry expressed in the concurring opinion of Justice Rehnquist, joined by the Chief Justice, in *Rosales-Lopez* is the concern that it "could well exacerbate whatever prejudice might exist without substantially aiding in exposing it." 101 S.Ct. at 1638. The three *Rosales-Lopez* dissenters took a broader view of the *necessity* for inquiry into the possible group prejudice of jurors. *Id.* at 1638–41.

to even roughly gauge with assurance, and will frequently depend on the circumstances of a particular case. It is both impractical and undesirable to lay down the sort of general rule implicit in the concept of challenge for cause for any but the clearest and strongest cases. This does not, however, mean that bias of a "lesser" kind has no tendency to undesirably inhibit the juror in the task of deciding the case solely on the evidence and the court's charge. *Cf. Queen v. Hepburn, supra.*

Moreover, even if the juror has a bias which would give rise to a proper challenge for cause, this fact may not be demonstrable. This was recognized in *Swain*, 85 S.Ct. at 836, as well as in a host of other decisions. *See, e.g., Hayes v. Missouri*, 120 U.S. 68, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887). As the New York Court of Appeals stated in *People v. McCray*, 57 N.Y.2d 542, 457 N.Y.S.2d 441, 444, 443 N.E.2d 915, 918 (1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983):

"First, jurors may be reluctant to admit their prejudices before spectators or others present in the courtroom during the *voir dire*. Second, certain prospective jurors may evade full disclosure of their prejudices in an effort to avoid being struck from the jury. Finally, other prospective jurors may simply be unaware of the existence of certain biases or prejudices they may harbor."

Further, the availability of the peremptory protects the challenge for cause by protecting against juror hostility resulting from the inquiry. *Swain*, 85 S.Ct. at 836; *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892). As expressed in *People v. McCray:*

"Pointed questions directed at an area as sensitive as a potential juror's racial, religious or sexual biases may, even where such biases do not exist, alienate a juror against counsel and his position." 457 N.Y.S.2d at 444, 443 N.E.2d at 918.[24]

Thus, the peremptory challenge plays an important role in the parties' quest for the "impartial" jury—the jury of the sixth amendment, composed of those who are willing and able to decide the case solely on the evidence and the law. As *Swain* states:

"The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." 85 S.Ct. at 835.

*See also Lewis*, 13 S.Ct. at 138 ("essential to the fairness of trial by jury"); *Hayes*, 7 S.Ct. at 351 ("to secure the impartiality of jurors"); *Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965) ("likely to produce a fair result"). The extent to which a juror's circumstances may affect his impartiality depends on the likelihood of the inference of bias and the strength of the bias inferred, under the facts of a particular trial, but not, *per se*, on whether the *source* of the potential bias is affiliation with a "cognizable" group as distinguished from all other possible sources. The potential for bias of Catholic against Ku Klux Klan member is not inevitably less in every trial than that of one with long hair[25] against the police.

It has been argued that one party's peremptories may exclude all of a minority group, while the other's peremptories will be insufficient to exclude the majority, with resulting unfairness to the minority party. *See Soares*, 387 N.E.2d at 516. To the

**24.** While conduct of *voir dire* by the judge may reduce the potential for hostility, it will not remove it. *See Commonwealth v. Sanders*, 383 Mass. 637, 421 N.E.2d 436, 439 (1981) (questioning along this line " 'may activate latent racial bias in certain prospective jurors or may insult others without uncovering evidence of bias in hard-core bigots who refuse to acknowledge their prejudice' "); *Rosales-Lopez v. United States*, 451 U.S. 182, 101 S.Ct. 1629, 1638, 68

L.Ed.2d 22 (1981) (Justice Rehnquist concurring; joined by Chief Justice Burger) ("could well exacerbate whatever prejudice might exist without substantially aiding in exposing it").

**25.** *Wheeler* suggests that length of hair is an "individual" characteristic on the basis of which peremptory challenge may be properly exercised. 148 Cal.Rptr. at 902, 583 P.2d at 760.

extent this reasoning implies that the resulting jury is *actually* unfair to the minority party, any such unfairness is no greater—and is indeed calculated to be less, for the reasons previously noted—than that which might exist where the lack of minority representation results from venire composition due either to chance or to the paucity of minority residents in the community, from challenge for cause, or from peremptory challenge for "individual" reasons. To the extent that the argument rests on analogy to the cross-section cases, either in their equal protection or in their sixth amendment rationales, it does not take into account the previously noted differences between the venire-formation and peremptory-challenge processes.

As a justification for prohibiting all peremptory challenges based on "cognizable" group affiliation, the "elimination of the minority" rationale is also subject to other objections. "Cognizable" group classifications are not limited to those of minority and majority, but rather include classifications such as gender, national ancestry, religion and possibly economic status, respecting which the divisions in a given community may be approximately equal.[26] Nor has it been suggested that group-based peremptories are permissible against majorities but not minorities.[27] Moreover, the prohibition presumably would extend to peremptories based on minority-group affiliation even where that minority group, either because of its chance "overrepresentation" on the particular venire or some other reason, would not be wholly eliminated from the panel or even reduced significantly below its proportion in the community.[28] Indeed, the minority might not be reduced below its proportion on the venire.[29]

**26.** Certainly the "cognizable" groups are not limited to race. Sex is included. *Taylor; Duren.* Cases following the *Wheeler* approach so recognize. *See, e.g., Commonwealth v. Reid,* 384 Mass. 247, 424 N.E.2d 495 (1981) (female defendant charged with murder of male properly prohibited from using her peremptory challenges to strike all six males on the venire). Other groups are likewise generally covered. *See Commonwealth v. Gagnon,* 16 Mass.App. 110, 449 N.E.2d 686 (1983) ("French" sounding last names, including "Roberts," "Christian," and "Roy"); *Soares,* 387 N.E.2d at 516 ("sex, race, color, creed or national origin"), 517 n. 35 (includes those "of Italian descent"); *Wheeler,* 148 Cal.Rptr. at 903, 583 P.2d at 761 (prohibiting peremptory challenge on "racial, religious, ethnic, or similar grounds"). Obviously, there are no real majority or minority "sexes." There will also frequently be instances where no single religious or national origin (or ethnic) group can be said to be a majority, and all are minorities in the particular community (or the aspects of the case which relate to possible intergroup biases may involve only two minority groups). This will also at least occasionally be the case with racial groups.

But the cognizable groupings extend even further. *Theil v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed.1181 (1946)—so often relied on by those opposed to *Swain* part II, *see, e.g., Booker,* at 768; *McCray,* 750 F.2d at 1127; *Wheeler,* 583 P.2d at 755–56—defines the cognizable groups which may not be systematically excluded from the pool of "prospective jurors" as being "all the economic, social, religious, racial, political and geographical groups of the community." *Theil,* 66 S.Ct. at 985. *Theil* was a civil case in which the exclusion of daily wage earners from the jury pool required reversal at the instance of a party not shown to be a member of that group. Plainly, there will be numerous instances where there is no "majority" economic, social, or geographical group in a given community.

**27.** *See, e.g., Soares,* 387 N.E.2d at 517 n. 35 (black defendant may not make racially based challenge against jurors of Italian descent); *Booker,* at 772–74 (black defendant's use of peremptories to strike white venirepersons); *Roman v. Abrams,* 608 F.Supp. at 631, 639–40 (prosecution's use of peremptories to exclude white venirepersons).

Further, there is no reason to assume that group-based peremptory challenges are only utilized where the challenged group can be wholly eliminated or proportionately significantly reduced. For example, in a given trial setting, group-based considerations, though present and decisive as to one or two challenges, may not be decisive as to any others, where particular "individual" characteristics may be more significant.

**28.** It may be argued that the minority is "entitled" to its chance "overrepresentation" on the jury, just as it is entitled to its chance "overrepresentation" on the venire. Again, however, this is an argument for a process, not for fairness in a given case. As an argument for a process, it fails to take into account the previously noted differences between the venire-formation and the peremptory-strike processes.

**29.** If a twenty-eight-person venire panel has ten "minority" members (about thirty-six percent of the panel), the six prosecution peremptory chal-

Finally, the "elimination of the minority" argument assumes that if the prosecution strikes minority group members on the basis of their group affiliation, then majority group members inevitably must be as likely to be as conviction prone as the minority group members are acquittal prone. This, in turn, assumes that in any such situation the minority and majority are equally homogeneous and stand at opposite poles from one another with respect to their attitudes concerning the case. However, this is not necessarily so. To the contrary, as applied to a given situation the feelings among any one group may be strong and nearly unanimous, while among another group there may be both substantially more diversity and less intensity of attitude.[30]

A somewhat analogous point is made in Note, *Peremptory Challenges and the Meaning of Jury Representation*, 89 Yale L.J. 1177 (1980). This student writing convincingly argues that prosecution group-based exercise of peremptories will tend to distort trial juries away from the mean of the community's relevant attitudes *only* when such attitudes are asymmetrically distributed about the community mean and the challenged group comprises an acquittal extreme more distant from the mean than the conviction extreme. In other situations, the prosecution's use of group-based peremptories will *enhance* the tendency of the trial jury to reflect the mean of community attitudes, while in still others it will have no effect one way or the other on that tendency.[31] Significantly, "[t]here is

lenges allowed by Fed.R.Crim.P. 24(b) used against minority members will leave four of the minority. If the defense uses its ten peremptories against the majority, the resulting jury will be thirty-three percent minority, approximately the same as the panel.

The presence of those on the panel with "individually" based potential leanings one way or the other may produce a similar result. If there are six of the minority on the twenty-eight-person panel, the prosecution may use three of its peremptories on majority members based on "individual" characteristics, and its remaining three peremptories on minority members based on their group affiliation. If the defense uses its ten peremptories against members of the majority, the resulting jury will have a slightly higher minority percentage (three of twelve) than did the panel (six of twenty-eight).

**30.** For example, in a given community the attitudes of blacks toward the Ku Klux Klan may well be nearly unanimous and strongly adverse, while the attitudes of whites may well be much more diverse and generally less intense across the spectrum.

And it would seem apparent that, at least in most situations, blacks are more likely to have a strong negative attitude to a witness shown to use anti-black epithets than whites are to have an equally strong positive attitude to such a witness. Nevertheless, the *Wheeler* theory has been held to prevent the party relying on such a witness from making racially based peremptory challenges of venirepersons belonging to the insulted group. *See People v. Johnson,* 22 Cal.3d 296, 148 Cal.Rptr. 915, 583 P.2d 774 (1978).

Again, an individual who is prominent in the local black community, as appellant Leslie apparently was, may well enjoy a generally favorable reputation among, or ·have potential for · influence over, blacks of that area, but may

have no reputation whatever among, or potential for influence over, any significant portion of the whites. While *voir dire* might disclose some of this, nevertheless some of the venire might not realize until later that this was the man they had previously heard favorably about, or might be reluctant to speak out, or would be more susceptible to a neighbor's chance comments during trial or the like.

**31.** Note, *Peremptory Challenges and the Meaning of Jury Representation*, 89 Yale L.J. 1177 (1980):

"Suppose that the social distribution, correctly reproduced on the venire, is asymmetrical about the mean—that the extremes in favor of acquittal are farther away from the mean than the extremes in favor of conviction. Suppose further that the acquittal extreme is occupied by members of some subgroup. In this case the normal operation of the peremptory will have a disproportionate impact on members of that subgroup. More importantly, it will distort the jury's mean in favor of conviction, because the prosecution's removal of subgroup members will not be fully balanced by the defense's peremptory elimination of pro-conviction jurors....

"On the other hand, the social distribution might be symmetrical about the mean, with extremes on both sides equally far away. If members of a subgroup are again supposed to occupy one of the extremes, the disproportionate removal of that subgroup will have absolutely no effect on the jury's mean impact. The effect of these removals would be fully offset by the removal of jurors at the , other extreme. In such a case, a rule protecting subgroups by limiting the peremptory would shift the jury's mean away from that of society, toward the extreme at which the pro-

currently no empirical evidence as to which distribution [of attitudes] exists in any given community for any range of cases." *Id.* at 1196.

■ We reaffirm our prior holdings that the group-based peremptory challenge of the kind considered in *Swain* part II is constitutional, not only under the equal protection clause but under the sixth amendment as well. This conclusion is premised on the understanding that such challenges do not run counter to, but rather form a recognized part of, the mix of values inherent in the concept of trial by jury as provided for in the sixth amendment and article III, section 2, clause 3.

*Supervisory Power*

■ We decline the invitation to achieve a different result under the guise of employing our supervisory power. To begin with, the same considerations that support or oppose the constitutional challenge equally support or oppose such employment of the supervisory power. "The values assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the" sixth amendment. *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 2446–47, 65 L.Ed.2d 468 (1980). Moreover, the numerous decisions that have left intact the prosecution's and defense's unfettered use of peremptory challenges for purposes of the particular case being tried were *not* decided on the theory that although racially based challenges are undesirable or even illegal they nevertheless are not so egregious as to be unconstitutional. Rather, those decisions were

based on the determination that such unfettered use, including consideration of group affiliation, is an essential element of the peremptory challenge itself and has consistently been recognized as a proper, important and integral part of trial by jury. For us to forbid such challenges in essence "amounts to a substitution of individual judgment for the controlling decisions" of the Supreme Court and the prior panels of this Court. *See Payner*, 100 S.Ct. at 2447. As the Second Circuit said in *United States v. Newman*, 549 F.2d 240, 250 (2d Cir. 1977), it would be an "unprecedented assumption of power."

In *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1978–79, 76 L.Ed.2d 96 (1983), the Supreme Court, rejecting use of the supervisory power to avoid the harmless error rule, explained:

"The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights [citations omitted]; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury [citations omitted]; and finally, as a remedy designed to deter illegal conduct [citation omitted]."

None of these considerations is significantly implicated here. There is no violation of recognized rights; instead, the suggested exercise of supervisory power would violate the long recognized rights of litigants to consider group affiliation in utilizing peremptory challenges for purposes of the case being tried and to do so free of judicial inquiry and control. And, as such exercise

tected group clustered. Under these circumstances, limiting the peremptory would cause the jury to be unrepresentative. ... Only if that subgroup is at an extreme of an asymmetrical social distribution will limiting the peremptory protect representation of the community. Otherwise, such a limitation would distort the community mean.

"Numerous other distributions of verdict impact in society can be imagined. In those that are symmetrical but that do not have a subgroup clustered at one end, both the normal and limited peremptory will have no systematic effect on the jury's mean. In those

that are symmetrical but that have subgroups distributed evenly throughout, both the normal and limited peremptory will distort the jury mean toward the nearer extreme. There is currently no empirical evidence as to which distribution exists in any given community for any range of cases. In the absence of knowledge as to the actual distribution for the geographic community from which a jury is drawn, neither the normal nor the limited peremptory has a predictable, systematic effect on the jury's mean verdict impact as compared to that of society." *Id.* at 1193–96 (footnotes omitted).

of peremptories is plainly legal, use of the supervisory power to prevent it may not be justified on the basis of deterring illegal conduct. Nor does such a use of the supervisory power in any way implicate "the considerations validly before the jury." *See also United States v. Gatto*, 763 F.2d 1040, 1046 (9th Cir.1985) (exercise of supervisory power proper "only when a recognized right has been violated," and even then suggesting caution).

Apart from the foregoing, other considerations likewise militate against such use of the supervisory power. The prosecution has been entitled to peremptory challenges, or their equivalent, continuously since the formation of our nation, as well as for centuries prior thereto under the common law. This right has had express statutory recognition continuously from 1865 until its inclusion in Rule 24(b) of the Federal Rules of Criminal Procedure effective in 1946, where to this date it has remained unchanged in any relevant particular.[32] Such a rule "has the force of a federal statute."

*Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 426, 85 L.Ed. 479 (1941). As previously noted, Congress in 1968, though obviously well aware of *Swain* and the long application of its principles in the federal courts, considered but elected "not [to] change the method of challenging jurors" and "in particular" determined to "leave[ ] undisturbed the right of a litigant to exercise his peremptory challenges." H.R.Rep. No. 1076, 90th Cong., 2d Sess., *supra*. Addressing cross-section concerns and prohibiting the exclusion of any class from jury service, Congress nevertheless excepted peremptory challenges from this prohibition and affirmatively authorized juror exclusion pursuant thereto. 28 U.S.C. § 1866(c). Nevertheless, we are asked to order a procedure which, as characterized in *Swain*, "entail[s] a radical change in the nature and operation of the challenge" and is directly contrary to its "essential nature," and "wholly at odds with the peremptory challenge system."[33] The super-

---

**32.** As reflected by the Advisory Committee notes pertaining to Rule 24(b), "[t]his rule embodies existing law" (with certain exceptions not here material).

These "pre-verdict" rules must be submitted to Congress during a regular session and are not effective until ninety days after such submission. 18 U.S.C. § 3771. This contrasts with "post-verdict" rules which need not be so submitted. *Id.* § 3772.

**33.** *Swain* describes the peremptory challenge as "'an arbitrary and capricious right ... [that] must be exercised with full freedom, or it fails of its full purpose.'" 85 S.Ct. at 835 (quoting *Lewis*, 13 S.Ct. at 139), and states that:

"The *essential* nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." 85 S.Ct. at 836 (emphasis added).

*Swain* also explains that to subject such challenges to the kind of scrutiny that appellant here demands of the district court

"would entail a *radical change* in the nature and operation of the challenge. The challenge, *pro tanto*, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity." *Id.* at 836–37 (emphasis added).

*Swain* likewise states that to "require[ ] an examination of the prosecutor's reasons for the exercise of his challenges in any given case," even where "all Negroes were removed from the jury ... because they were Negroes," is to "establish a rule *wholly at odds* with the peremptory challenge system as we know it." *Id.* at 837 (emphasis added).

The *Swain* dissent similarly eschewed any rule under which "a prosecutor's motives are subject to question or judicial inquiry when he excludes Negroes or any other group from sitting on a jury in a particular case. Only where systematic exclusion has been shown, would the State be called upon to justify its use of peremptories ...." *Id.* at 849.

Decisions of this Court are in accord. *See Davis v. United States*, 374 F.2d at 5 ("The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subjected to the Court's control."); *United States v. Pearson*, 448 F.2d at 1216 (questioning of prosecutor as to his reasons for exercising peremptories "would be inconsistent with the peremptory challenge system"); *United States v. Carlton*, 456 F.2d at 208 ("The subjective thought process of the prosecutor in deciding which prospective jurors to strike in a given case is beyond inquiry of the Court, trial or appellate ...."). Surely in these cases, and in the many other direct appeals of federal criminal convictions where we and other Circuits have applied *Swain*, there was ample awareness of the supervisory power. Indeed, in

visory power simply does not extend to making changes of that nature and magnitude in the system established by Congress and the statutory rule-making process. In *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 1225 n. 11, 3 L.Ed.2d 1287 (1959), the Supreme Court observed that "[t]he power of this Court to prescribe rules of procedure and evidence for the federal courts exists only in the absence of a relevant Act of Congress." There, the Court declined to expand the production requirements provided by the Jenks Act, even though that "statute does not, in so many words, state that it is the exclusive, limiting means of compelling" production. *Id.*, 79 S.Ct. at 1223. The same considerations apply to the Rules of Criminal Procedure, which have statutory effect. *Sibbach*, 61 S.Ct. at 426. Moreover, the Supreme Court has emphasized the value placed by Congress on "the reservation of the power to examine proposed rules, laws and regulations before they become effective." *Id.* at 427. This plainly applies to pre-verdict rules of criminal procedure. *See* note 32, *supra*. We should not make an end run around that process. Indeed, even where the matter is not within an area concerning which Congress has made such a reservation of power, basic procedural

innovations of great importance to litigants, as the suggested change in the peremptory challenge most certainly is, call for exercise of the statutory rule-making process. As the Supreme Court observed in *Miner v. Atlass*, 363 U.S. 641, 80 S.Ct. 1300, 1305–06, 4 L.Ed.2d 1462 (1960):

"[T]he matter is one which, though concededly 'procedural,' may be of as great importance to litigants as many a 'substantive' doctrine, and which arises in a field of federal jurisdiction where nationwide uniformity has traditionally always been highly esteemed.

"The problem then is one which peculiarly calls for exacting observance of the statutory procedures surrounding the rule-making powers of the Court, see 28 U.S.C. § 331, 28 U.S.C.A. § 331 (advisory function of Judicial Conference), 28 U.S.C. § 2073, 28 U.S.C.A. § 2073 (prior report of proposed rule to Congress), designed to insure that basic procedural innovations shall be introduced only after mature consideration of informed opinion from all relevant quarters with all the opportunities for comprehensive and integrated treatment which such consideration affords." [34]

*Carlton* we specifically cited *Hall v. United States*, 168 F.2d 161 (D.C.Cir.), *cert. denied*, 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775 (1948), in support of our *Swain* holding, and were presumably aware of the *Hall* dissent's express reliance on the supervisory power. *Carlton*, 456 F.2d at 208.

**34.** In *Miner* the Supreme Court refused to sustain, under former General Admiralty Rule 44 which expressly granted general rule-making authority to district courts, a local rule authorizing discovery depositions, which theretofore had not been authorized in admiralty.

In *Colgrove v. Battin*, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), the Supreme Court sustained a local district court rule providing for a six-person civil jury, holding that it was authorized by Fed.R.Civ.P. 83. The Court distinguished *Miner* on the ground that whether the jury was six or twelve was not a matter of "great importance to litigants." 93 S.Ct. at 2456 n. 23. *Colgrove* is inapposite here for two reasons. First, *Colgrove* dealt with the exercise of expressly delegated rule-making power under Rule 83 and 28 U.S.C. § 2071. While Fed.R.

Crim.P. 57 and 28 U.S.C. § 2071 authorize district courts to make rules governing the practice in criminal cases in their courts, there is no *express* delegation of power to the courts of appeals to make rules governing the practice in district courts (*cf.* Fed.R.App.P. 47). Indeed, Rule 57 concludes by expressly stating that "in all cases not provided for by rule, the district judges ... may regulate their practice in any manner not inconsistent with these rules or those of the district in which they act." Here, our supervisory power to require district courts to regulate peremptory challenges in a certain way must arise by implication. In that circumstance, the *Miner* caution is particularly appropriate. Finally, we *do* consider the matter of freedom in the exercise of peremptory challenges for the purpose of the case being tried as something which is of "great importance to litigants." That, indeed, is clear from Justice White's opinion in *Swain*. 85 S.Ct. at 835. *See also Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894); *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892); *Hayes v. Missouri*, 120 U.S. 68, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887).

*See also United States v. Isthmian Steamship Co.,* 359 U.S. 314, 79 S.Ct. 857, 862, 3 L.Ed.2d 845 (1959) ("if the law is to change it should be by rulemaking or legislation and not by decision").

Neither *Thiel v. Southern Pac. Co.,* 66 S.Ct. 984 (1946), nor *Ballard v. United States,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), fairly supports a contrary analysis. *Ballard,* expressly, and *Thiel,* implicitly, rest on the proposition that the practices there condemned constituted "a departure from the statutory scheme." *Ballard,* 67 S.Ct. at 265 (also at 264). *See also Thiel,* 66 S.Ct. at 987 (nothing in "federal or state law" justifies the condemned practice). Here the very opposite is the case: what we are asked to decree is "a radical change" from, and "wholly at odds" with, the "essential nature" of a right expressly authorized by the Federal Rules of Criminal Procedure and 28 U.S.C. § 1866(c). Further, *Ballard* and *Thiel* are supported by "[t]he American tradition of trial by jury." *Thiel,* 66 S.Ct. at 985; *Ballard,* 67 S.Ct. at 263. Here we are asked to enact a practice that flies directly in the face of that tradition. Finally, *Thiel* and *Ballard* involved judicial supervision of the judiciary—the Supreme Court supervising the lower federal court-formulated venire summons practice. Here, by contrast, we are asked to intrude into decisions committed by law to the executive branch, namely,

against whom should its peremptory strikes be exercised for the purpose of a particular case. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), is inapposite for all the same reasons.[35]

Moreover, the rule appellant asks us to adopt will either eviscerate the defense's use of peremptories or improperly tilt the scales of justice against the prosecution. Of course, the prosecution is entitled to a fair trial and the defense is not entitled to a jury partial in its favor. Challenges are one means to this end. *See Wainwright v. Witt,* — U.S. ——, 105 S.Ct. 844, 851–52, 83 L.Ed.2d 841 (1985); *Smith v. Balkcom,* 660 F.2d at 579; *Spinkellink v. Wainwright,* 578 F.2d 582, 596 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). The prosecution is no less entitled to the unfettered use of its allotted peremptories than the defense. As the Supreme Court said in *Hayes v. Missouri,* 120 U.S. 68, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887), in such matters "the scales are to be evenly held" between prosecution and defense. This view was reaffirmed in *Swain* respecting the same proffered restriction on prosecution exercise of peremptories that is at issue here. 85 S.Ct. at 835. Similarly, in *Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965), a unanimous

---

**35.** The Eight Circuit's supervisory power decisions in this context do not persuade us to the contrary. They involve claims that the challenges were of the *Swain* part III variety, and arise out of the Eighth Circuit's "concern because of the frequency with which we have been called upon to examine the prosecutor's practices in this regard in the Western District of Missouri." *United States v. Jackson,* 696 F.2d 578, 592 (8th Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). *See also United States v. Greene,* 626 F.2d 75, 76–77 (8th Cir.), *cert. denied,* 449 U.S. 876, 101 S.Ct. 220, 66 L.Ed.2d 98 (1980) ("[O]n several previous occasions black defendants have attacked the conduct of the prosecutor's office in the Western District of Missouri in exercising peremptory challenges against prospective black jurors."). Thus, in *United States v. Nelson,* 529 F.2d 40, 43 (8th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2631, 49 L.Ed.2d 377 (1976), the Court affirmed the conviction in reliance on *Swain* (as

it has in all other such cases), but stated, "Should the prosecutors' practices ... continue, we are sure that the district judges in the Western District of Missouri will take appropriate action."

Similarly, in *United States v. McDaniels,* 379 F.Supp. 1243 (E.D.La.1974), a new trial was granted on the basis of a *Swain* part III claim which was supported by an analysis of the prosecution's peremptory challenges over the past two years combined with black underrepresentation on venire lists. *Id.* at 1248–49. This Court specifically distinguished *McDaniels* on that ground in *United States v. McLaurin,* 557 F.2d at 1077 n. 19. We adhere to that distinction.

Here there is not only no proof of prior practice or noncase-specific use, there is no such *claim;* indeed, appellant admits that "there is no pattern or practice in the United States District Court for the Eastern District of Louisiana."

Court, speaking through Chief Justice Warren, stated:

"The Constitution recognizes an adversary system as the proper method of determining guilt, and the Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result. This recognition of the Government's interest as a litigant has an analogy in Rule 24(b) of the federal rules, which permits the Government to challenge jurors peremptorily."

Rule 24(b) neither by its terms nor its history makes any distinction between the prosecution and defense with respect to the reasons for which peremptory challenges may be exercised. By what right, then, may we do so?

We note that every jurisdiction which has spoken to the matter, and prohibited prosecution case-specific peremptory challenges on the basis of cognizable group affiliation, has held that the defense must likewise be so prohibited. *See Wheeler*, 583 P.2d at 765 n. 29 ("[T]he People no less than individual defendants are entitled to a trial by an impartial jury drawn from a representative cross-section .... [W]hen a white defendant is charged with a crime against a black victim, the black community as a whole has a legitimate interest in participating .... [T]hat interest will be defeated if the prosecutor does not have the power to thwart any defense attempt to strike all blacks ...."); *Soares*, 387 N.E.2d at 517 n. 35; *Commonwealth v. Reid*, 384 Mass. 247, 424 N.E.2d 495 (1981); *Commonwealth v. DiMatteo*, 12 Mass.App. 547, 427 N.E.2d 754 (1982); *State v. Neil*, 457 So.2d

at 487 ("[B]oth the state and the defense may challenge the allegedly improper use of peremptories. The state, no less than a defendant, is entitled to an impartial jury" (footnote omitted).); *Booker v. Jabe, supra,* at 772 ("[W]e hold that under the Sixth Amendment, neither prosecutor nor defense counsel may systematically exercise peremptory challenges to excuse members of a cognizable group from service on a criminal petit jury."). *See also United States v. Clark*, 737 F.2d 679, 682 (7th Cir.1984) ("It would be hard to argue that only a defendant should be allowed to challenge racially motivated peremptory challenges.... [T]he prosecutor would be allowed to object to the defendant's making racial peremptory challenges if the defendant could object to the prosecutor's doing so.").[36]

Accordingly, adoption of the position contended for by appellant seems likely to ultimately result in a serious weakening of what the Supreme Court has justly described as " 'one of the most important of the rights secured to the accused,' Pointer v. United States, 151 U.S. 396, 408 [14 S.Ct. 410, 414, 38 L.Ed. 208] ... [1894] ... [t]he denial or impairment of ... [which] is reversible error without a showing of prejudice, Lewis v. United States, *supra;* Harrison v. United States, 163 U.S. 140 [16 S.Ct. 961, 41 L.Ed. 104] ... [1896]." *Swain*, 85 S.Ct. at 835. No longer, then, could the defendant "peremptorily challenge 'on his own dislike' "; no longer would we follow the rule that whatever "prevents or embarrasses the full, unrestricted exercise by the accused of that right must be condemned." *Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894).[37]

**36.** Some jurisdictions following *Wheeler* have apparently not directly ruled on this question. *See State v. Crespin*, 612 P.2d at 718.

**37.** Our concerns are not at all alleviated by the case-by-case type approach suggested by the panel majority. 759 F.2d at 374. Such a restriction on *Swain* part II peremptories is subject to virtually all the·same objections as the apparently more rigid *Wheeler, Soares,* and *McCray* approach. Whatever little is thereby

gained in flexibility will inevitably be lost in uncertainty and difficulty of administration. Indeed, difficulty of administration has been a major criticism of the *Wheeler* line of cases. *See, e.g., McCray,* 750 F.2d at 1140 (dissenting opinion); *United States v. Clark,* 737 F.2d 679, 682 (7th Cir.1984)·("making the voir dire a Title VII proceeding in miniature"); *Roman v. Abrams,* 608 F.Supp. 629, 638 (S.D.N.Y.1985) ("The transactional costs involved in litigating whether the reasons are 'pretextual' will be vast

## III.

### Conclusion

We are persuaded that prosecution or defense peremptory challenges of the *Swain* part II variety are constitutional and lawful notwithstanding that they may be motivated in whole or in part by the challenged venireperson's race, gender, or other group affiliation, and that such motivation is not the proper subject of judicial inquiry in cases of this kind where there is no claim or reason to suspect that the challenges are not made for purposes of securing a jury favorable to the case at hand. We further decline to change this settled rule by the exercise of supervisory power, which we conclude would be both unwarranted and unwise. Hence we reject appellant Leslie's complaints respecting the prosecution's exercise of its peremptory challenges in this case, and his conviction is affirmed.

AFFIRMED.

JERRE S. WILLIAMS, Circuit Judge, with whom JOHN R. BROWN, ALVIN B. RUBIN, TATE and JOHNSON, Circuit Judges, join, dissenting:

The broadly ranging and scholarly opinion for the En Banc Court focuses largely upon the issue of whether it violates the United States Constitution for a prosecutor in a state or federal case to use peremptory challenges for racially discriminatory purposes unless there is a pattern or practice of invidious discrimination shown in a number of cases. This is an exceedingly important issue. It is worthy of en banc consideration in this Court, and it is now before

the United States Supreme Court in *Batson v. Kentucky,* argued Dec. 11, 1985, 54 U.S. L.W. 3445. The En Banc Court uses the *Leslie* case as a vehicle to confirm on this issue the Supreme Court's seminal holding in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

But that is not the narrow issue posed by this case. See the panel opinion, *United States v. Leslie,* 759 F.2d 366, 373 (5th Cir.1985). The case which is before us is a poor vehicle to carry the load of a reexamination of that fundamental issue. Indeed, the constitutional issue of *Swain* was not even raised by the defendant in this case. Simply stated, appellant's claim is that because the defendant in this federal prosecution raised the issue of possible invidious discrimination in the prosecutor's jury challenges, the district judge properly should have inquired into that issue under the exercise of his power to insure that justice be done in federal prosecutions. Because the opinion for the Court goes far beyond this narrow claim, and because the district judge erroneously denied having any power to make such an inquiry when such power is present, I am constrained to dissent.

The prosecutor in this case may have had valid and acceptable reasons to have focused his peremptory challenges upon members of the black race. The error was that the district judge refused to inquire into the prosecutor's reasons on the sweeping ground that he simply had no power under the law to do so. It is this assertion by the judge that he had no legal authority to inquire which is the only issue in the case before the Court. Insofar as the opin-

---

and the reliability of the results uncertain."); *Schreiber v. Salamack, supra* (approximately same facts as *Roman,* opposite result); *King v. County of Nassau,* 581 F.Supp. 493, 502 (E.D.N.Y.1984).

Such difficulty will necessarily be greatly exacerbated by the approach taken by the panel majority which suggests that where race is taken into account in making a peremptory challenge for purposes of the case being tried this in some instances may be justified and in others may not, but suggesting no criteria for determining justification. Nor is any guidance offered on whether other cognizable groups are

covered by the suggested rule, or, if so, what such groups are. Nor is there any indication whether the suggested rule extends to defendants or to civil cases. The inevitable result would be that no one—judges, lawyers, or litigants—would know which peremptories were allowed and which were not, and virtually all "peremptory" challenges would be subject to question. And with the uncertainty there would also come the less-than-candid and the self-deceptive explanations. A likely further consequence would then be a transition to the more rigid *Wheeler* approach, also encompassing defendants as it does.

ion for the Court can be read as denying that power to the district court, I insist that it is incorrect as established by well-developed and recognized legal principles.

To make the issue clear, suppose in this case that upon inquiry by the district judge the prosecutor had said something to the effect that he challenged the blacks because he did not like blacks, he did not think they are fit to sit in any case, and regardless of the nature of the case he had intentionally used the challenges to engage in racial discrimination. Under the analysis of the district judge and the majority of this Court, the holding would be that the district judge had no power to take any action to remedy this blatant racial discrimination. A fair trial to this particular defendant would be sacrificed on the altar of requiring a pattern or practice of discrimination proved statistically over a number of cases later to follow. I cannot conceive that the majority of this Court would hold if a prosecutor made such a statement in open court explaining his peremptory challenges that he was acting within his right.

The panel opinion made clear it was not barring all racial consideration in voir dire examination and in the use of peremptory challenges. *United States v. Leslie,* 759 F.2d at 374. There was no negation of a power in the prosecutor and the discretion in the district judge to allow challenges seemingly on a racial basis which have rational explanations. It must be stressed again that the only issue arises because the federal district court took the position that it had no power to make such an inquiry of a prosecutor.

It is well here to be reminded of the classic definition of the federal prosecutor's role given by the Supreme Court in the case of *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In that case the Court reversed a federal conviction on the ground that the government prosecutor had overstepped the bounds of propriety and fairness in the prosecution of the case. The Supreme Court explained the nature of the prosecutor's duty and the values the duty is designed to effect:

The United States Attorney is a representative not of an ordinary party to the controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that *guilt shall not escape or innocence suffer.* He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. *It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.*

*Id.* at 88, 55 S.Ct. at 633 (emphasis added). The panel opinion set out this quotation and then went on to quote from several other cases of this Court. For example, in *United States v. Corona,* 551 F.2d 1386, 1391 (5th Cir.1977), we said that a prosecutor must "conduct criminal trials with an acute sense of fairness and justice." Then in *United States v. Beckett,* 706 F.2d 519, 521 n. 5 (5th Cir.1983), we said that the cherished title "United States Attorney" is not a hunting license which exempts its holder from the ethical constraints of advocacy.

One other important and well-known introductory proposition must be stated. Although the historical roots of the peremptory challenge in the American system of justice run deep, peremptory challenges are not commanded by the United States Constitution. *See McCray v. New York,* 461 U.S. 961, 103 S.Ct. 2438, 2442 n. 7, 77 L.Ed.2d 1322 (Marshall, J., dissenting from denial of certiorari); *Rosales-Lopez v. United States,* 451 U.S. 182, 188 n. 6, 101 S.Ct. 1629, 1634 n. 6, 68 L.Ed.2d 22 (1981); *Swain,* 380 U.S. at 219, 85 S.Ct. at 835. Yet, while peremptory challenges do not have constitutional foundation, the principle which competes with the peremptory challenge in this case, the prohibition

against racial discrimination, is solidly grounded in the Constitution. We should at least be wary of exalting a procedure not protected by the Constitution over a clearly established constitutional principle. Even *Swain* clearly stands for the proposition that peremptory challenges are not wholly immune from constitutional implications. *Swain* holds that the use of peremptory challenges for racially discriminatory purposes as a pattern or practice violates the Constitution. The peremptory challenge is not an untouchable, as the basic thrust of the en banc opinion would have us believe.

With this preliminary statement of the issue which is actually before this Court, I now turn my attention to whether the supervisory power of the federal courts, based upon a long and honorable history, can fairly be said to support the proposition that in order to insure a fair trial, we can direct a district court to inquire into the motives of prosecutors in exercising peremptory challenges when claim is made that they may be exercising that power with invidious racially discriminatory motives.

The remainder of this opinion is directed at showing that the panel acted properly and justifiably in invoking the supervisory power of this Court. The role and the scope of the supervisory power are delineated by establishing four basic propositions. Taken together, these propositions, in my view, clearly demonstrate the correctness of the holding of the panel majority. First, this Court possesses broad supervisory powers over lower courts. Second, there is no doubt that the supervisory powers of federal courts may be used to correct injustices which do not amount to constitutional or statutory violations. Third, the supervisory power—encompassing broadly several forms of deterrence of prosecutorial misconduct—is appropriate on the facts of the present case. Fourth, although Congress undoubtedly has the right to override supervisory power rulings through legislation, Congress has not spoken with respect to the narrow holding of the panel. Each proposition is discussed in turn.

First, the federal appellate courts possess broad supervisory powers. The supervisory power doctrine was articulated over four decades ago in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). As the en banc majority notes, the supervisory power allows courts to "preserve judicial integrity by insuring that a conviction rests upon appropriate considerations validly before the jury." *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). This power has been invoked in a "surprising variety of situations. The commentators have uniformly marveled at how flexible and extensive the supervisory power is." Imwinkelried, *United States v. Payner and the Still Unanswered Questions About the Federal Courts' Supervisory Power Over Criminal Justice,* 7 J.Crim. Def. 1, 9 (1981); *see also* Beale, *Reconsidering Supervisory Power in Criminal Cases: Constitutional and Statutory Limits on the Authority of the Federal Courts,* 84 Colum.L.Rev. 1433 (1984); Hill, *The Bill of Rights and the Supervisory Power,* 69 Colum.L.Rev. 181 (1969); Comment, *Judicially Required Rulemaking as Fourth Amendment Policy: An Applied Analysis of the Supervisory Power of Federal Courts,* 72 Nw.U.L.Rev. 595, 596 (1977); Note, *The Judge-Made Supervisory Power of the Federal Courts,* 53 Geo.L.J. 1050, 1078 (1965).

Courts have applied the supervisory power to announce new jury selection standards for civil actions, and even to establish standards for administrative hearings. *See Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); *Woodby v. I.N.S.,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). The Supreme Court has used its supervisory power to reverse convictions supported by false evidence, to curtail improper practices by federal attorneys, to suppress evidence government agents gained through misconduct, to preserve a criminal contemner's right to a jury trial, and to protect a defendant from an overzealous district court

judge. *See United States v. Leslie*, 759 F.2d at 371 (panel opinion citing extensive list of cases). The courts have also used the supervisory power to control conduct within the grand jury room, *see e.g. United States v. Hogan*, 712 F.2d 757 (2d Cir.1983), and to control the conduct of both prosecutors and police outside the court room. *United States v. Martin*, 480 F.Supp. 880 (S.D.Tex.1979). The Supreme Court has also used the supervisory power to prevent the exclusion from jury service of members of distinctive groups of the community. *Thiel*, 328 U.S. at 217, 66 S.Ct. at 984, 90 L.Ed. at 1181 (daily wage earners); *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (women).[1]

These examples show a supervisory power so broad and extensive that any attempt at an all-inclusive definition must necessarily fail. *See* Note, 53 Geo.L.J. at 1050 ("The variety of situations in which [the supervisory power] has been invoked defies any attempt to construct a definition of supervisory power which is at once comprehensive and accurate.... The sole common denominator of its usage is a desire to maintain and develop standards of fair play in the federal courts more exacting than the minimum constitutional requirements of due process."). The reason for such a broad power is that the courts must be given the ability to preserve the integrity of the judicial system. *Hasting*, 461 U.S. at 505, 103 S.Ct. at 1978. Thus, it is no wonder that "[t]he Supreme Court undoubtedly possesses an historical power of supervision over its inferior courts; in the absence of legislative action, its power to correct lower federal court procedures deemed unfair or unjust seem subject to no substantial limitations." Note, *The Supervisory Power of the Federal Courts*, 76 Harv.L.Rev. 1656 (1963).

This Court possesses supervisory power over district courts coextensive with that possessed by the Supreme Court. "[E]very Court of Appeals ... that has confronted the issue" has laid claim to the supervisory power. *Burton v. United States*, 483 F.2d 1182, 1187 (9th Cir.1973) (citing numerous federal decisions); *see also Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (recognizing the lower courts' exercise of the supervisory power); Imwinkelried, *supra* at 3; Beale, *supra* at 1455 ("[B]oth the Supreme Court and the lower federal courts have generally assumed that these courts possess supervisory authority in their own circuits or districts like that wielded by the Supreme Court on a nationwide level.").

Thus, it must be concluded beyond dispute that the first proposition is established. This Court possesses a broad authority to correct lower court procedures under our supervisory power.

The second proposition is that the supervisory power exists to correct injustices which do not amount to statutory or constitutional violations. There is no serious doubt that this is the case. The Supreme Court held in *McNabb:* "[T]he scope of our reviewing power over convictions brought here from the federal courts is not confined to ascertainment of Constitutional validity. Judicial supervision of the administration of criminal justice in the federal courts ... [is] not satisfied merely by observance of ... minimal [constitutional] safeguards...." 318 U.S. at 340, 63 S.Ct. at 613. The Court has steadfastly adhered to the notion that the supervisory power is an appropriate tool to correct injustices which do not amount to constitutional or statutory violations. *See, e.g., Hasting*, 461 U.S. at 505, 103 S.Ct. at 1978 ("[F]ederal courts may, within limits, formulate procedural

---

1. The en banc majority attempts to distinguish *Thiel* on the theory that "the practices there condemned constituted 'a departure from the statutory scheme.'" At 564 (quoting *Ballard*). The flaw in this asserted "distinction" is that the decision in *Thiel* was *expressly made on supervisory power grounds, not statutory grounds. See Thiel*, 328 U.S. at 225, 227, 66 S.Ct. at 988, 989 (The majority stated that its holding rested upon "our power of supervision over the administration of justice in the federal courts"). The dissent agreed that the "problem is one of judicial administration." In *Ballard*, 329 U.S. at 192, 67 S.Ct. at 263, the Court also stated that *Thiel* rested on supervisory power grounds.

rules not specifically required by the Constitution or the Congress ... to preserve judicial integrity...."); *Cupp*, 414 U.S. at 146, 94 S.Ct. at 400 ("[T]he appellate court ... may likewise require [the trial court] to follow procedures deemed desirable from the viewpoint of sound judicial practice although in no-wise commanded by statute or by the Constitution.").[2]

This proposition is critical to an understanding of the difference between this dissent and the en banc majority. The basic thrust of the en banc majority appears to be that court or defense inquiry into the prosecutor's reasons for making a peremptory strike is not a constitutional right. Since the supervisory power is a separate body of law, the constitutional arguments are not dispositive. Nor is this distinction between constitutional rights and supervisory power rulings merely a distinction without a difference. Unlike constitutional decisions, supervisory power rulings affect only the federal courts, and are subject to legislative override. As noted by Professor Beale:

Courts employing supervisory power have generally felt relatively free to adopt rules intended to promote what the courts identify as the ends of justice and good public policy. Supervisory power has proven to be an attractive vehicle for rulings that the federal courts might have been more hesitant to ground on a constitutional theory. Supervisory power rulings pose no risk of friction between the federal and state courts since by definition such rulings apply only in federal proceedings. Moreover, if a supervisory power ruling proves to be impractical or otherwise undesirable, it is far easier to alter than a constitutional decision. Supervisory power rulings may be freely revised by the courts themselves, and they are also subject to revision by legislation. As a result, supervisory power rulings have been employed to impose more rigorous standards in federal proceedings than the

---

**2.** The fact that the supervisory power is used in the federal courts to correct injustices not amounting to constitutional violations is graphically illustrated by comparing *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) with *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). In both cases jurors had been exposed to newspaper stories relating that the defendant, who did not testify, had been convicted previously of serious offenses. In both cases the exposed jurors swore to the satisfaction of the judge that they would not be influenced by the news articles and would decide the case only on the evidence. In *Marshall* the Court reversed the federal defendant's conviction, but in *Murphy*, decided 15 years later, the Court affirmed the state defendant's conviction. The *Murphy* opinion made the distinction clear. The Court said that the supervisory power applies only to federal prosecutions. The Supreme Court reversed Marshall's conviction " '[i]n the exercise of [its] supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts,' and not as a matter of constitutional compulsion.... We cannot agree that *Marshall* has any application beyond the federal courts." *Murphy*, 421 U.S. at 797, 95 S.Ct. at 2035.

A similar pair of contrasting cases involving juror fairness is *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931) and *Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). In both cases the black defendant was accused of killing a white police officer. In both cases the defendant requested, but was refused, voir dire examination directed to racial prejudice. The Court reversed the conviction of the federal defendant in *Aldridge;* it affirmed the conviction of the state defendant in *Ristaino*. The distinction again made was the difference between constitutional and supervisory jurisprudence:

Although we hold that *voir dire* questioning directed to racial prejudice was not constitutionally required, the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant. Under our supervisory power we would have required as much of a federal court faced with the circumstances here.

*Ristaino*, 424 U.S. at 597 n. 9, 96 S.Ct. at 1022 n. 9.

Because *Swain* was a state prosecution, the supervisory power was not available on the facts of that case. Thus, the fact that *Swain* held that inquiry into the prosecutor's motives was not constitutionally compelled gave no answer at all to the question of whether a federal court should attempt to effect some moderating influence on the practice by resort to its authority in "the formulation and application of proper standards for the enforcement of the *federal* criminal law in the *federal* courts." *McNabb*, 318 U.S. at 341, 63 S.Ct. at 613.

minimal standards imposed by the Constitution.

Beale, 84 Colum.L.Rev. at 1434. Moreover, the supervisory power is designed to protect recognizable institutional goals in the federal courts. "The use of supervisory powers supports two institutional goals: deterring future prosecutorial misconduct and maintaining the integrity of the judicial process. These goals are separate from the goal of protecting a defendant's constitutional right to a fair trial." Note, *The Exercise of Supervisory Powers to Dismiss a Grand Jury Indictment—A Basis for Curbing Prosecutorial Misconduct*, 45 Ohio St.L.J. 1077, 1084 (1984); *see also United States v. Sears, Roebuck Co.*, 719 F.2d 1386, 1394 (9th Cir.1983) (Norris, J. dissenting in part), *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984).

It is clear, therefore, that this Court possesses the supervisory power to correct injustices which are neither constitutional nor statutory violations. The use of the supervisory power does not constitute an "end run" around the Constitution, but rather rests upon the firm policy grounds of allowing the Court to preserve the integrity of the federal judicial system without making a ruling carrying the baggage of a constitutional decision.[3]

The third proposition is that the supervisory power is appropriately applied to the facts of the present case. As noted above, the supervisory power is broadly available to insure the integrity of the judicial process. It cannot seriously be doubted that excluding blacks from juries motivated purely by invidious racial discrimination, and for no other reason, is an anathema to the concept of a fair judicial system. As one commentator has noted:

> A peremptory challenge exercised on the sole ground of group affiliations suggests that a particular juror is unfit to give the defendant a fair trial, not because of her own idiosyncratic prejudices, but rather as the inevitable consequence of group antagonism. This assumption perpetuates stereotypes that are no longer tolerated in any other area of the law.

Note, *The Defendant's Right to Object to Prosecutorial Misuse of the Peremptory Challenge* 92 Harv.L.Rev. 1770, 1781 (1979); *see also Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940) ("For racial discrimination to result in the exclusion from jury service of otherwise qualified groups ... is at war with our basic concepts of a democratic society and a representative government.").

The supervisory power has been used countless times to deter myriad instances of prosecutorial misconduct. *See e.g., United States v. Leslie*, 759 F.2d at 371 (citing several examples of use of supervisory power over prosecutors). In our criminal justice system, a prosecutor "is both an administrator of justice and an advocate.... [His] duty ... is to seek justice, not merely to convict." I ABA, *Standards for Criminal Justice* 3–1.1(b) & (c) (1980); *see also Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Obviously, there is no place for invidious racial discrimination in the administration of justice. The supervisory power is an appropriate vehicle for insuring that a prosecutor carries out his ethical obligations. *See e.g., United States v. Serubo*, 604 F.2d

---

**3.** The en banc majority cites *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), for the proposition that " '[t]he values assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the' sixth amendment." At 561 (quoting *Payner* ). The *Payner* decision, however, does nothing to limit the scope of the supervisory power available in the present case. *Payner* held only that the supervisory power could not be invoked to exclude evidence seized from a third party not before the court. *Id.* at 753,

100 S.Ct. at 2446. The *Payner* majority distinguished supervisory power cases cited by the dissent on the ground that "none of those cases involved criminal defendants who were not themselves the victims of the challenged practices." *Id.* at 735 n. 8, 100 S.Ct. at 2446 n. 8. In the present case, there is no issue involving the use of supervisory powers to aid parties not before this Court. The *Payner* Court specifically stated that "our decision today does not limit the traditional scope of the supervisory power in any way, nor does it render that power " 'superfluous' ". *Id.*

807, 818 (3d Cir.1979). We cannot know what were the prosecutor's motives in the present case because the judge did not inquire. That is precisely the reason that the panel held that our supervisory power must be used to compel an answer from the prosecutor on the facts of this case.[4]

The en banc majority mis-characterizes the holding of the panel when it argues that this use of the supervisory power is inappropriate because it constitutes a "radical" change from preexisting law. As support for that assertion, the en banc majority cites *Swain*. *See* at 562. *Swain*, however, held that inquiry into the motives of the prosecutor was not a *constitutional* right. *Swain*, 380 U.S. at 222, 85 S.Ct. at 837 ("[W]e cannot hold that *the Constitution* requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case.") (emphasis add-

ed). *Swain* has nothing to do with the supervisory power of this Court.[5] Indeed, on the facts of *Swain*, the Court could not have had any effect upon supervisory power jurisprudence, because *Swain* was a state prosecution, and the supervisory power as has already been pointed out applies only in federal prosecutions. *Cupp*, 414 U.S. at 146, 94 S.Ct. at 400, 38 L.Ed.2d 368.

Other courts have exercised their supervisory authority to ensure that federal prosecutors do not employ peremptory challenges to engage in racial discrimination. For example, in *United States v. McDaniels*, 379 F.Supp. 1243 (E.D.La. 1974), my brother Rubin, then a district judge, granted a new trial under Rule 33 "in the interest of justice" because the prosecutor used all six of his peremptory challenges against blacks.[6] Likewise, in

---

**4.** The en banc majority's argument that the supervisory power is not appropriate on the facts of this case because this case involves use of the power against the executive branch—namely, the prosecutor—rather than against a judicial officer is unpersuasive. The supervisory power has been used countless times against executive officers. In fact, *McNabb* itself used the supervisory power to suppress evidence in order to deter unlawful conduct of executive officials. As one commentator has noted:

> *McNabb* cannot be confined within a definition of the supervisory power which does not transcend elementary notions of judicial housekeeping. The behavior which invoked exclusion was not that of judicial officers, but that of the police. Furthermore, it occurred at a time substantially prior to the trial itself.

Note, 76 Harv.L.Rev. at 1661; *see also* Hill, 69 Colum.L.Rev. at 203 ("It is disingenuous to assert that no infringement upon executive prerogatives is involved when the courts do no more than withhold the process that is invoked by the executive in a criminal prosecution."). Space limitations do not allow a citation to every supervisory power case in which executive, rather than judicial, misconduct was being deterred. *See e.g. United States v. Leslie*, 759 F.2d at 371 (several cases cited).

**5.** The en banc majority quotes extensively from *Swain* in its discussion of the supervisory power at 562 n. 33. Several *Swain* quotations are used in such a way that the impression might be given that *Swain* held that the use of supervisory power in the manner of the panel opinion would entail a radical change from pre-existing preemptory challenge law. *Swain* did not so hold.

For example, n. 33 of the en banc majority reads:

> *Swain* also explains that to subject such challenges *to the kind of scrutiny that appellant here demands* (emphasis added) of the district court "would entail a *radical change* in the nature and operation of the challenge ..." (quoting *Swain* ).

The en banc majority's quotation from *Swain* omits the first few words of the sentence. The entire sentence actually reads "To subject the prosecutor's challenge in any particular case to *the demands and traditional standards of the equal protection clause* would entail a radical change in the nature and operation of the challenge." Thus, the quotation in *Swain* was discussing the challenge under the equal protection clause, not the use of supervisory power. *See McNabb*, 318 U.S. at 340, 63 S.Ct. at 613; Note, 45 Ohio St.L.J. at 1084 (constitutional challenge distinct from supervisory power challenge).

**6.** The en banc majority's undertaking to distinguish *McDaniels* is far short of adequate. The majority states that in *McDaniels* "a new trial was granted on the basis of a *Swain* part III claim [*i.e.*, systematic exclusion of blacks] which was supported by [statistical evidence]." Yet Judge Rubin specifically held that the *Swain* test *had not been met*. *McDaniels*, 379 F.Supp. at 1248: "The defendant here has failed to show the 'systematic exclusion' of blacks prohibited ... in *Swain*." Judge Rubin granted the new trial "in the interest of justice" *despite* the failure of the *Swain* challenge. *Id.* at 1249.

The majority goes on to say that "this Court specifically distinguished *McDaniels* on that ground in *United States v. McLaurin*, 557 F.2d at

---

**573**

*United States v. Jackson,* 696 F.2d 578 (8th Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983), the trial judge issued an order granting the defendant's motion "to prevent the use of peremptory challenges by the prosecution to strike black or other minority members from the jury ... unless the government can show good reason why a black or other minority member should be stricken...." The Eighth Circuit Court of Appeals specifically approved this use of the supervisory power. *Id.* at 592–93.[7]

Also relevant is the recent case of *United States v. Campbell,* 766 F.2d 26 (1st Cir.1985). This case involved an objection by the defendant to the federal prosecutor's use of a peremptory challenge to strike a black from his jury. District Judge Keeton at the trial held a hearing on defendant's objection, and he personally questioned the prosecutor as to his motives in exercising the challenge. The district judge concluded that the government's purpose in the challenge was not racially motivated. The Court of Appeals, without specifically approving or disapproving the district judge's procedure, upheld the conviction on the ground that the finding of the district judge exonerating the prosecutor from misuse of the challenge by racial motivation was well supported in the record. This holding made inquiry into the application of the *Swain* rule unnecessary.

It is apparent that an attempt to eliminate the ugly spectre of invidious racial discrimination from the federal courts is an appropriate use of the supervisory power.

The fourth premise is that Congress has not spoken on the narrow issue which was the holding of the panel. The en banc majority contends that Congress through contrary legislation has effectively precluded our use of the supervisory power in a peremptory challenge case. The en banc opinion cites Rule 24(b) of the Federal Rules of Criminal Procedure and the Federal Jury Selection and Service Act of 1969, 28 U.S.C. § 1861 *et seq.* Neither of these congressional actions discusses the issue of whether the judge has the power to make inquiry of the prosecutor's reasons for striking blacks when requested by the defendant. The en banc opinion erroneously attempts to characterize the panel holding broadly—as creating a right for the defendant to prevent the prosecutor from taking racial factors into account in his peremptory strikes—and then proceeds to strike down this "straw man" with congressional enactments.[8] Neither of these congressional enactments, however, even remotely mentions whether a defendant may be permitted to inquire into a prosecutor's motive for striking all blacks from a jury panel.

Rule 24(b) speaks only to the number of peremptory challenges. It goes no further and does not define what is meant by "peremptory," whether peremptories might not

---

1077 n. 19." In *McLaurin,* this Court held that the district court did not abuse its discretion in not ordering a new trial "in the interest of justice." There was no statistical evidence but also there was a failure "to demonstrate—or even to offer to demonstrate—that the government had excluded the potential jurors in question for racial reasons." 557 F.2d at 1064. While the Court did make reference to the aid given Judge Rubin by statistical evidence, nowhere does *McLaurin* distinguish *McDaniels* as resting upon *Swain* part III grounds.

**7.** The en banc majority again attempts to distinguish *Jackson* as resting upon a successful *Swain* part III challenge. At 564 n. 35. It is clear, however, that *Jackson* did *not* rest upon *Swain* grounds. *See* 696 F.2d at 593 n. 9 (defendant did not even attempt to make a *Swain* III showing).

**8.** For example, the en banc majority cites *Miner v. Atlass,* 363 U.S. 641, 80 S.Ct. 1300, 4 L.Ed.2d 1462 (1960), for the proposition that rules of "great importance to litigants" should be reserved for congressional decision. The majority then states that the peremptory challenge system is a matter of great importance to litigants. I do not disagree. Given the panel's holding, however, the *proper question* is whether the right to refuse to give a reason when invidious racial discrimination is suspected in exercising peremptory strikes is a matter of "great importance to litigants." I submit that no one has any legitimate interest in furthering invidious racial discrimination. A refusal to provide a non-invidious reason intrinsically must be a matter "of great importance" to a litigant.

be subject to limited review and supervision by the court, nor whether there might not be some point beyond which the exercise of peremptories passes beyond "arbitrary" into "intolerable". Congress has never legislatively defined what a peremptory challenge is in the federal system. It is clear that Rule 24(b) speaks only to the number of peremptory strikes allowed, and has absolutely no substantive content regarding the definition or use of peremptory strikes.[9]

Nor does the Federal Jury Selection and Service Act of 1968 constitute congressional preemption of the panel's use of the supervisory power. The primary function of that law is to prevent discrimination in jury panels; thus, the Act focuses on the means of compiling jury lists and on juror qualifications, and it provides an "exclusive" mechanism for challenge which shuts down once "voir dire examination begins." 28 U.S.C. § 1867(a). Peremptory challenges and challenges for cause are mentioned only incidentally, and are reaffirmed as operating outside of the act as "provided by law." [10] In other words, the act says nothing substantive at all about the law, the practice, the definition, or the outer limits of the peremptory challenge.[11]

The panel majority held narrowly and precisely that when requested by a defendant the district court had the power to ask a prosecutor for his reasons for striking all blacks from a jury panel. That is all. This Court undoubtedly has the broad supervisory power to require such an inquiry in appropriate instances. This is a proper use of the supervisory power because it will on its face promote the interests of justice. Congress has not spoken on this question. In dissenting, therefore, I adhere to the holding of the panel. I find the broad sweep of the majority opinion uncalled for in this case. I further find justified the precise use of supervisory power to insist that a district court can inquire into suspected racial discrimination in the use of peremptory challenges by government prosecutors. Ugly in its practice and insidious in its effects, invidious racial discrimination deserves no protection in any area of society, least of all in the administration of justice in the federal courts.

---

**9.** The conclusion that Rule 24(b) has no substantive content is apparent by examining Rule 24(a) jurisprudence. Rule 24(a) specifies who may conduct the voir dire, and if the judge chooses to do so, how supplemental questions by the parties are to be asked to the jurors. Under the en banc majority's view, Congress has certainly "legislated" in the area of voir dire just as it has "legislated" in the area of peremptory strikes, so the supervisory power would not be available in either instance. But this is not so. The Supreme Court has used its supervisory power to require that voir dire questions on racial prejudice be asked. *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). This practice was approved in *Ristaino v. Ross*, 424 U.S. 589, 597 n. 9, 96 S.Ct. 1017, 1022 n. 9, 47 L.Ed.2d 258 (1976).

**10.** Subsections (3) and (4) of the provision in 28 U.S.C. § 1866(c) specify "[t]hat any persons summoned for jury service may be ... (3) excluded upon peremptory challenge *as provided by law,* or (4) excluded pursuant to the procedure *specified by law* upon a challenge by a

party for good cause shown...." (emphasis added).

**11.** The en banc opinion refers to H.R.Rep. No. 1076, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Admin.News 1792, 1795, for the following quotation: "[T]he bill leaves undisturbed the right of the litigant to exercise his peremptory challenges ..." This comment adds nothing substantive to what is "provided by law" for peremptory practices. This dissent could equally cite the following passage in the House Committee Report, at 1797, and yet not advance my legal argument either:

> Jury performance will be enhanced as well by closer approximation of the cross sectional goal under the bill. It must be remembered that the jury is designed not only to understand the case, but also to reflect the community's sense of justice in deciding it. As long as there are significant departures from the cross sectional goal, biased jurors are the result—biased in the sense that they reflect a slanted view of the community they are supposed to represent.